**In re LIVE CONCERT ANTITRUST LITIGATION.**

No. 06–ML–1745–SVW (RCx).

United States District Court,
C.D. California.

Oct. 22, 2007.

Chul Pak, Wilson Sonsini Goodrich & Rosat, New York, NY, James F. Speyer, Heller Ehrman, Los Angeles, CA, for Defendant.

ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [79] AND DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [74]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

This Multi–District Litigation ("MDL") consists of twenty-two class actions from across the country against Defendant Clear Channel Communications, Inc. and its subsidiaries.[1] The Plaintiffs, individuals who

1. *Margaret Thompson v. Clear Channel Communications, Inc.*, CV 05–6704–SVW (RCx) (Southern California Region); *Malinda Riley v. Clear Channel Communications,* CV 06–2381–SVW (RCx) (Chicago Region); *Priscilla Diaz v. Clear Channel Communications, Inc.*, CV 06–2380–SVW (RCx) (South Florida Region); *Mark Cooperberg v. Clear Channel Communications, Inc.*, CV 06–2382–SVW (RCx) (Philadelphia Region); *Hayes Young v. Clear Channel Communications, Inc.*, CV 06–3701–SVW (RCx) (New York/New Jersey Region); *Adam Rosen v. Clear Channel Communications, Inc.*, CV 06–3965–SVW (RCx) (New England Region); *Nicole Latour v. Clear Channel Communications Inc.*, CV 06–4973–SVW (RCx) (Northern California Region); *James Friedman v. Clear Channel Communications, Inc.*, CV 06–4974–SVW (RCx) (Michigan Region); *Corey Rosen v. Clear Channel Communications, Inc.*, CV 06–4980–SVW (RCx) (Northern California Region); *Jennifer Zbytowski v. Clear Channel Communications, Inc.*, CV 06–4985(RCx) (Michigan Region); *Lauren Hammer v. Clear Channel Communications, Inc.*, CV 06–4987–SVW (RCx) (Colorado Region); *Coya Bailey v. Clear Channel Broadcasting, Inc.*, CV 06–4990–SVW (RCx) (Carolina Region); *Daniel Hull v. Clear Channel Communications, Inc.*, CV 06–5000–SVW (RCx) (Atlanta Region); *Terry Leitner v. Clear Channel Communications, Inc.*, CV 06–5008(RCx) (Middle Ohio River Basin Region); *Kevin MacLaughlan v. Clear Chan-*

purchased tickets to live rock concerts, allege that Clear Channel and its subsidiaries engaged in unlawful and anticompetitive activities to acquire, maintain, and extend its monopoly power in various regional ticket markets for live rock concerts. In each of the twenty-two class actions, the Plaintiffs filed substantively identical complaints which allege three causes of action: (1) monopolization in violation of 15 U.S.C. § 2; (2) attempted monopolization in violation of 15 U.S.C. § 2; and (3) unjust enrichment. Plaintiffs seek damages and injunctive relief.

For purposes of efficiency, the Court ordered that discovery be initially limited to the five regional markets of Boston, Chicago, Denver, Los Angeles, and New Jersey/New York. *See* (Order Narrowing the Scope of Class Discovery, Nov. 1, 2006.) The Court ordered the Plaintiffs to file motions for class certification in these five markets pursuant to an attached discovery schedule. (*Id.*)

Plaintiffs filed motions for class certification in the five test cities on March 7, 2007. Defendant filed a motion for judgment on the pleadings on Plaintiffs' second cause of action on March 6, 2007. The Court held a hearing on June 4, 2007 at which time both parties presented expert testimony. The Court ordered the parties to submit supplemental briefing concerning class certification following the hearing. Both Plaintiffs and Defendants also supplemented the class certification record with additional evidence following the hearing.

## II. FACTUAL ALLEGATIONS

The Plaintiffs allege that Defendant Clear Channel engaged in unlawful and anticompetitive activities to acquire, maintain, and extend its monopoly power in various regional markets for live rock concerts.

### A. The Parties

Plaintiff Malinda Riley is a resident of Chicago, Illinois. (Riley Compl. ¶ 9.) Plaintiff Margaret Thompson is a resident of Los Angeles, California. (Thompson Compl. ¶ 9.) Plaintiff Lauren Hammer is a resident of Boulder, Colorado. (Hammer Compl. ¶ 9.) Plaintiff Kevin MacLaughlan is a resident of Medford, Massachusetts. (MacLaughlan Compl. ¶ 9.) Plaintiff Hayes Young is a resident of New Jersey. (Young Compl. ¶ 9.) All of the Plaintiffs purchased one or more tickets to rock concerts promoted by Defendants in their respective regions during the defined class period. (Riley Compl. ¶ 9; Thompson Compl. ¶ 9; Hammer Compl. ¶ 9; Young Compl. ¶ 9; MacLaughlan Compl. ¶ 9.)

Defendant Clear Channel Communications, Inc. ("Clear Channel Communications") was incorporated in Texas with its principal place of business in Texas. (Riley Compl. ¶ 10.)[2] Defendant Clear Channel Radio, Inc. ("Clear Channel Radio") is a wholly-owned subsidiary of Clear Channel Communications. (Riley Compl. ¶ 12.) Clear Channel Radio was incorporated in Nevada with its principal place of business in Kentucky. (Riley Compl. ¶ 12.) Defendant Clear Channel Broadcasting, Inc. ("Clear Channel Broadcasting") was incorporated in Nevada with its principal place of business in Texas. (Riley Compl. ¶ 13.)

SFX Entertainment, Inc. ("SFX") was one of the world's largest promoters and venue operators for live entertainment events in the late 1990s. (Riley Compl. ¶ 14.) Clear Channel Communications acquired SFX in 2000 and changed SFX's name to Clear

nel Communications, Inc., CV 06–5012 SVW (RCx) (New England Region); *Daniel Woodring v. Clear Channel Communications, Inc.,* CV 06–5018–SVW (RCx) (Middle Ohio River Basin Region); *Melissa Lewis v. Clear Channel Communications, Inc.,* CV 06–5024–SVW (RCx) (Philadelphia Region); *Graham Sevier–Schultz v. Clear Channel Communications, Inc.,* CV 06–5058(RCx) (Houston Region); *Katherine Ludt v. Clear Channel Communications, Inc.,* CV 06–5091–SVW (RCx) (Wisconsin Region); *Julie Walker v. Clear Channel Communications, Inc.,* CV 06–5653–SVW (RCx) (District of Columbia Region); *Cheryl Hintzen v. Clear Channel Com-*

*munications, Inc.,* CV 06–7522–SVW (RCx) (Arizona Region); *Judy Kent v. Clear Channel Communications, Inc.,* CV 06–7523–SVW (RCx) (Seattle Region).

2. Because the complaints in the cases are substantively identical except for the named plaintiffs and the geographic region, the Court refers to the complaint in *Malinda Riley v. Clear Channel Communications, et. al.,* CV 06–2381–SVW (RCx) (Chicago Region) for purposes of convenience.

Channel Entertainment, Inc. ("Clear Channel Entertainment") in July 2001. (Riley Compl. ¶¶ 11, 14.) Clear Channel Entertainment is a wholly-owned subsidiary of Clear Channel Communications and was incorporated in Delaware with its principal place of business in New York., (Riley Compl. ¶¶ 11,-14.) In December 2005, Clear Channel Communications spun-off Clear Channel Entertainment as a publicly traded company named Live Nation, Inc. ("Live Nation"). Live Nation was incorporated in Delaware with its headquarters in California. (Riley Compl. ¶ 14.) When all of the Defendants are referenced collectively, the Court will refer to them as "Clear Channel."

### B. The Concert Promotion Industry

Musical artists contract with booking agents to serve as the artists' authorized representatives concerning the booking of live concerts. (Riley Compl. ¶ 19.) Booking agents "sell" concerts to concert promoters. (*Id.*) The concert promoter subsequently "resells" the concert to the public in the form of a concert ticket. (*Id.*)

The concert promoter is financially responsible for the concert. For example, the concert promoter is responsible for advertising and marketing the concert (e.g. promoting the concert on the radio). (*Id.* ¶ 20.) Also, the concert promoter is responsible for concert expenses such as transportation, hotel costs, sound and lighting equipment, security, ushers, ticket takers, and stage managers. (*Id.*) Additionally, the concert promoter is responsible for securing the venue for the concert. (*Id.*) Whether the promoter earns a profit depends on the revenue generated from ticket sales and other sources of income such as sponsorship deals, food and beverage sales, and merchandise sales. (*Id.* ¶ 21.)

### C. Overview of Clear Channel Communications

Clear Channel Communications is a publicly-traded, multimedia corporation. Clear Channel is the largest owner of radio stations in the United States. (Riley Compl. ¶ 24.) The 1200 radio stations owned or programmed by Defendant dwarfs its next largest radio competitor, Infinity Broadcasting Corp., which operates only 183 stations. (*Id.*) Clear Channel's radio stations reach more than 110 million listeners nationwide each week. (Riley Compl. ¶ 25.)

As noted above, Clear Channel entered the live entertainment business in August 2000 when it acquired SFX Entertainment, Inc.[3] (Riley Compl. ¶ 23.) SFX was one of the largest national concert promoters following SFX's acquisition of several independent concert promoters in 1997. (*Id.* ¶ 23.) With the acquisition of SFX, Clear Channel generates approximately 70% of concert ticket revenue in the United States. (*Id.* ¶ 28.) Clear Channel produces more than 26,000 live entertainment events per year, and owns or controls more than 135 live entertainment venues. (*Id.* ¶ 24.) Clear Channel produced major music tours including U2, Madonna, Janet Jackson, N'SYNC, Britney Spears, Backstreet Boys, Dave Matthews Band, The Rolling Stones, and Tina Turner. (*Id.* ¶ 28.)

Clear Channel also operates more than 700,000 outdoor advertising displays, such as billboards, and owns or operates more than 19 television stations. (Riley Compl. ¶ 24.)

### D. Alleged Anticompetitive Conduct

Plaintiffs allege that "Clear Channel has engaged in a vast array of anticompetitive, predatory and exclusionary practices in the course of acquiring, maintaining and extending its monopoly power in the relevant market." (Riley Compl. ¶ 35.) First, Plaintiffs claim that Clear Channel substantially eliminated competition in the radio and concert promotion markets. For example, Clear Channel increased its market power through the acquisition or merger of primary competitors such as the AM/FM and SFX mergers. (*Id.* ¶ 36.)

Second, Plaintiffs allege that Clear Channel has leveraged its market power in the radio market to increase its market power in the concert promotion market. Specifically, Plaintiffs claim that "Clear Cannel repeatedly has used it [sic] size and clout to coerce artists—including artists who had pre-exist-

---

**3.** As noted above, Clear Channel changed SFX's name to Clear Channel Entertainment.

ing business relationships with competitors—to use Clear Channel to promote their concerts or else risk losing airplay and other on-air promotional support on radio stations owned or otherwise controlled by Clear Channel." [4] (*Id.* ¶ 41.) Airplay of music and concert promotion on radio stations can determine the financial success of a concert. (*Id.* ¶ 40.)

Similarly, Plaintiffs claim that Clear Channel Radio has limited advertising availability, charged excessive advertising rates, and misrepresented the availability of advertising to competing promoters and artists not promoted by Clear Channel. [5] (*Id.* ¶ 48.)

Finally, Plaintiffs allege that Clear Channel bids up the fees for artists to levels at which competing promoters cannot compete. For example, Plaintiffs claim that Clear Channel will guarantee artists more than 100 percent of gross sales in exchange for the right to promote the artist's concert. (*Id.* ¶ 46.) As a result, competing producers must either pass on such artists or promote the artists at a guaranteed loss. [6] (*Id.*)

### E. Alleged Effects of Clear Channel's Conduct

Plaintiffs claim that Clear Channel's conduct had various anticompetitive effects on the concert promotion industry. For example, Plaintiffs allege that Clear Channel's conduct has restrained potential competitors from entering and competing in the market. (Riley Compl. ¶ 49.) Plaintiffs claim that they suffered damage by being charged supra-competitive ticket prices by Clear Channel. (Riley Compl. ¶¶ 64, 68.)

## III. PROCEDURAL HISTORY

### A. New York Litigation

In 2002, Plaintiff Melinda Heerwagen filed a civil antitrust action against Defendant Clear Channel in the Southern District of New York. *Heerwagen v. Clear Channel Entm't, Inc.*, 2003 WL 24467832, at *1 (S.D.N.Y. Aug.13, 2003). Heerwagen alleged that Clear Channel engaged in unlawful and anticompetitive activities to acquire, maintain, and extend its monopoly power in the national ticket market for live rock concerts. The district court ruled that the relevant market was local, rather than national, and therefore denied the petition for class certification. The court explained that proof specific to individual putative class members in different geographic markets would predominate over common questions of law and fact. *Id.*

The Second Circuit affirmed the district court's denial of class certification based on the plaintiff's failure to show that the live rock concert ticket market was national. *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 227 (2d Cir.2006). Because the Second Circuit held that the plaintiff failed to demonstrate live rock concerts constitute a single geographic market national in scope, the Second Circuit did "not address the issue of whether the rock concert ticket market is a single product market." *Id.*

### B. MDL Litigation

On September 12, 2005, Plaintiff Margaret Thompson filed a complaint against Defendant Clear Channel in this Court. *Margaret Thompson v. Clear Channel Communications, Inc., et al.*, CV 05–6704–SVW (RCx) (Southern California Region). Similar to *Heerwagen*, Plaintiff Thompson alleged that Clear Channel and its subsidiaries engaged in unlawful and anticompetitive activities to acquire, maintain, and extend its monopoly power in various regional ticket markets for live rock concerts. The only difference between Thompson's complaint and *Heerwagen* is that Thompson defined the putative class

---

4. Similar allegations were made in *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F.Supp.2d 1048, 1061–1065 (D.Colo.2004).

5. Similar allegations were made in *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 224 (2d Cir.2006).

6. Although not mentioned in the complaints, in Plaintiffs' motion for class certification the Plaintiffs allege that Clear Channel used its control of concert venues to monopolize the market. (Pl.'s Mem. at 9–10.) For example, Plaintiffs claim that Clear Channel refuses to rent its venues to other promoters. (*Id.*)

as encompassing the Southern California region whereas the putative class in *Heerwagen* was national.

Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred related actions pending outside the Central District of California to this Court on April 19, 2006. (Transfer Order, Apr. 19, 2006.) A total of twenty-one cases were eventually transferred to this Court. *See infra* n. 1. In each of the twenty-two class actions, the Plaintiffs filed substantively identical complaints.

For purposes of efficiency, the Court ordered that discovery be initially limited to the five regional markets of Boston, Chicago Denver, Los Angeles, and New Jersey/New York. *See* (Order Narrowing the Scope of Class Discovery, Nov. 1, 2006.) Plaintiffs filed motions for class certification in the five test cities on March 7, 2007. Defendant filed a motion for judgment on the pleadings on Plaintiffs' second cause of action on March 6, 2007.

## IV. CHOICE OF LAW

■ A difficult initial question is determining which circuit's law applies when resolving questions of federal law in this multi-district litigation.[7] The Manual for Complex Litigation (4th ed.2004) provides the following instruction about choice of law:

> Complexities may arise where the rulings turn on questions of substantive law. In diversity cases, the law of the transferor district follows the case to the transferee district. Where the claim or defense arises under federal law, however, the transferee judge should consider whether to apply the law of the transferee circuit or that of the transferor court's circuit, keeping in mind that statutes of limitations may present unique problems.

§ 20.132.

Prior to 1987, numerous courts applied the law of the transferor jurisdiction in MDL proceedings involving federal law. *See In re The Dow Company "Sarabond" Prods. Liab.*

*Litig.*, 666 F.Supp. 1466, 1468 n. 3 (D.Colo. 1987) (listing cases applying law of the transferor jurisdiction). In 1987, the D.C. Circuit ruled that the law of the transferee applies when construing federal law in an opinion authored by then Judge Ruth Bader Ginsburg. *In re Korean Air Lines Disaster*, 829 F.2d 1171 (D.C.Cir.1987). Specifically, the D.C. Circuit held:

> The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit .... the law of a transferor forum on a federal question—here, the law of the Second Circuit—merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit.

*Id.* at 1176. The D.C. Circuit based its determination on four grounds. First, the Court determined that prior federal courts had based their decision on an inapplicable Supreme Court opinion involving state choice-of-law issues rather than federal choice-of-law issues. *Id.* at 1173–1175. Second, the Court found that "[a]pplying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings." *Id.* at 1175. Third, the Court determined that it would be "inherently self-contradictory" and "logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law." *Id.* at 1175–76. Finally, the Court explained that " '[i]f ... more than one interpretation of federal law exists, the Supreme Court of the United States can finally determine the issue and restore uniformity in the federal system.' " *Id.* at 1176 (quoting *In re Korean Air Line Disaster of*

---

7. Complicating the Court's analysis is the fact that none of the parties briefed this issue in any of the motions.

*Sept. 1, 1983,* 664 F.Supp. 1488, 1489 (D.D.C. 1987)).

Following the D.C. Circuit's decision, circuit and district courts, including the Ninth Circuit, have uniformly applied the law of the transferee circuit in MDL proceedings involving federal law. *See, e.g., Newton v. Thomason,* 22 F.3d 1455, 1460 (9th Cir.1994); *Temporomandibular Joint (TMJ) Implant Recipients v. E.I. Du Pont de Nemours & Co.,* 97 F.3d 1050, 1055 (8th Cir.1996); *Murphy v. F.D.I.C.,* 208 F.3d 959, 964–65 (11th Cir.2000); *Bradley v. United States,* 161 F.3d 777, 782 n. 4 (4th Cir.1998); *Menowitz v. Brown,* 991 F.2d 36, 40–41 (2d Cir.1993);

*Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126 (7th Cir.1993). *See also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 2005 WL 106936 at *4 n. 37 (S.D.N.Y. Jan.18, 2005) (listing examples of district court opinions holding that questions of federal law are governed by the law of the transferee circuit). For example, in *Newton* the Ninth Circuit held that "when reviewing federal claims, a transferee court in this circuit is bound only by our circuit's precedent." 22 F.3d at 1460. The Court follows the approach mandated by *Newton* and *Korean Air Lines Disaster.*[8] Therefore, the Court will give the precedent of transfer-

---

**8.** The Court recognizes that the district court in *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 241 F.R.D. 185, 193 (S.D.N.Y. 2007) concluded that it was required to apply the law of the transferor circuit in resolving a motion for class certification, even though the same district court had previously held that the court was only bound by the law of the transferee court in a motion to dismiss in the same case. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.,* 2005 WL 106936 (S.D.N.Y. Jan.18, 2005). However, this Court is not bound by *MTBE* and the reasoning of *MTBE* is unpersuasive for several reasons.

The *MTBE* court reasoned that the Supreme Court's decision in *Lexecon v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) undermined the Second Circuit's decision in *Menowitz v. Brown,* which held that the law of the transferee circuit applied in a MDL. *MTBE,* 241 F.R.D. at 191–92. In *Lexecon,* the Supreme Court held that transferee courts were prohibited from retaining § 1407 cases for trial through a self-transfer under § 1404. 523 U.S. at 40, 118 S.Ct. 956. The Court held that § 1407 required the transferee court to remand all? cases to the transferor courts at the conclusion of pretrial proceedings. *Id.* The *MTBE* court found that *Lexecon* undercut the reasoning of *Menowitz.*

The *MTBE* court is correct that one rationale offered in support of applying the law of the transferee circuit was that the vast majority of cases were resolved prior to trial or otherwise self-transferred under § 1404 to the transferee court for joint trial. *See, e.g., In re Korean Air Lines,* 829 F.2d at 1176–86 (D.H. Ginsburg, J., concurring). This rationale is undermined by *Lexecon.* However, as explained above, decisions such as *In re Korean Air Lines* have offered numerous other rationales for applying the law of the transferee circuit such as the reduction in efficiency of forcing a court to apply divergent interpretations of governing federal law and the logical inconsistency of requiring one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law. 829 F.2d at 1173–76. The Ninth

Circuit relied on *In re Korean Air Lines,* rather than the rationale undermined by *Lexecon. Newton,* 22 F.3d at 1460 ("[I]n resolving an identical question under 28 U.S.C. § 1407, the D.C. Circuit correctly pointed out that '[b]inding precedent for all [courts] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit [in the absence of Supreme Court authority].'") (quoting *In re Korean Air Lines Disaster,* 829 F.2d at 1176). Therefore, the Court concludes that *Newton's* holding continues to control because the reasoning of *In re Korean Air Lines* is not undermined by *Lexecon.*

Second, the *MTBE* court reasoned that "[i]t would be neither just nor efficient to apply the law of this Circuit in considering class certification, and then force the transferor court to try a class action that it might never have certified." 241 F.R.D. at 193. However, the D.C. Circuit rejected this argument in *In re Korean Air Lines* and explained that forcing the transferor court to apply the law of the transferee court promotes efficiency:

> Should the several cases consolidated for pretrial preparation in the instant proceeding eventually return to transferor courts outside this circuit, would our district court's Warsaw Convention/Montreal Agreement ruling, which we have affirmed, have binding force? We believe it should, as "law of the case," for if it did not, transfers under 28 U.S.C. § 1407 could be counterproductive, i.e., capable of generating rather than reducing the duplication and protraction Congress sought to check.... On this issue in the case at hand, however, our circuit is not positioned to speak the last word.

829 F.2d at 1176.

Finally, the district court's decision is contrary to the determination of every other federal court to consider the issue subsequent to *Lexecon. See, e.g., In re Gen. Am. Life Ins. Co. Sales Practices Litig.,* 391 F.3d 907, 911 (8th Cir.2004) ("When a transferee court receives a case from the MDL Panel, the transferee court applies the law of the circuit in which it is located to issues of federal

or circuits "close consideration," but the Court is only bound by Ninth Circuit and Supreme Court precedent.

## V. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiffs filed a motion for class certification in each of the 7 five test cases: Chicago, Los Angeles, Denver, Boston, and New York/New Jersey. Plaintiff's proposed class in the Chicago case is "All persons who purchased tickets to any live rock concert in the Chicago Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present." (Pl.'s Mem. at 1.) The definitions for the other test cases are identical except for the geographic region.[9]

### A. General Standard for Class Certification

Rule 23(a) provides that a class member may sue as a representative party on behalf of all class members if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If the prerequisites of Rule 23(a) are satisfied, Plaintiff must also satisfy Rule 23(b)(1), (b)(2), or (b)(3). Plaintiff seeks to certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3). Rule 23(b)(3) provides that "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition ... the court finds that the questions of law or fact common to the

members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

"The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Dukes v. Wal–Mart, Inc.*, 474 F.3d 1214, 1224 (9th Cir.2007).

### B. Assessment of the Evidence in a Motion Certification

 A significant issue in resolving Plaintiffs' motion is determining whether the Court may make factual findings in determining whether the requirements of Rule 23 are satisfied. Plaintiffs contend that the Court may not engage in a "battle of the experts" and must certify the class so long as Plaintiffs' expert has "employed a well-accepted methodology to reach his opinions ... and his testimony has a reliable basis in knowledge and experience of the relevant discipline." (Pls.' Post–Hearing Brief at 3–4.) (quoting *Dukes*, 474 F.3d at 1227). In contrast, Defendants contend that "analysis of the merits is permissible to determine if Rule 23 Requirements are met." (Defs.' Post–Hearing Brief at 2.)

As discussed below, Rule 23 is silent on this issue, the Supreme Court has never directly addressed this issue, and the Circuits appear to be split on this issue.

### 1. Text and Amendments to Rule 23

Rule 23 does not provide what standard of proof a Plaintiff must satisfy in order to

law."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 912 n. 17 (6th Cir.2003); *Murphy*, 208 F.3d at 964–66; *In re Gen. Motors Corp. "Piston Slap" Products Liab. Litig.*, 2006 WL 1049259, at *2 n. 6 (W.D.Okla. Apr.19, 2006); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 323 F.Supp.2d 861, 876–77 (S.D.Ohio 2004); *Moore v. Sulzer Orthopedics, Inc.*, 337 F.Supp.2d 1002, 1009–11 (N.D.Ohio 2004); *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 2004 WL 1237497, at *7–14 (S.D.Tex. May 20, 2004); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 300 F.Supp.2d 1020, 1031 n. 9 (D.Or.2003); *In re Ikon Office Solutions, Inc. Sec.*

*Litig.*, 86 F.Supp.2d 481, 484 (E.D.Pa.2000); *Hartline v. Sheet Metal Workers' Nat'l. Pension Fund*, 201 F.Supp.2d 1, 2–4 (D.D.C.1999); *In re Baseball Bat Antitrust Litig.*, 75 F.Supp.2d 1189, 1200 (D.Kan.1999); *In re Indep. Serv. Orgs. Antitrust Litig.*, 1998 WL 919125, at *2–3 (D.Kan. Dec.31, 1998).

9. The Los Angeles case defines the region as "Southern California," the Boston case defines the region as "New England," the Denver case defines the region as "Colorado," and the New York/New Jersey case defines the region as "New York/New Jersey." (Pl.'s Mem. at 1–2.)

obtain class certification. Nor does Rule 23 explain whether a district court may make factual findings in determining whether the requirements of Rule 23 have been satisfied. However, the 2003 amendments to Rule 23 arguably support the inference that a district court is not permitted to engage in a more extensive inquiry in determining whether the requirements of Rule 23 have been satisfied.

First, the amendments to Rule 23 eliminated the prior Rule 23(c)(1)(C) provision that allowed the conditional granting of class certification. Second, Rule 23(c)(1)(A) previously stated that a class certification decision be made "as soon as practicable." The amendments changed Rule 23(c)(1)(A) to state that a decision should be made "at an early practicable time." Finally, the Advisory Committee notes provide that a "court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed.R.Civ.P. 23(c)(1)(C) Adv. Comm. Notes 2003. The Committee further explains that

> [a]lthough an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making a certification decision on an informed basis.

*Id.*

Based on these amendments and comments, the Second Circuit has noted that a district court may be permitted "a more extensive inquiry into whether Rule 23 requirements are met than was previously appropriate." *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 39 (2d Cir.2006). However, for reasons discussed below, the Ninth Circuit has apparently rejected the holding of *In re IPO Securities Litigation. See Dukes*, 474 F.3d at 1227. Therefore, it is unclear whether the Second Circuit's view of the effect of the 2003 amendments carries any weight in the Ninth Circuit.

## 2. Supreme Court Treatment of Rule 23

The first major Supreme Court case to address this issue was *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). In *Eisen*, the district court determined that the Rule 23 class certification requirements were satisfied. *Id.* at 161, 94 S.Ct. 2140. In determining which party should bear the cost of providing notice to the class, the district court reasoned that it was unfair to impose the cost of notice on the defendants unless the plaintiffs showed a probability of success on the merits. *Id.* at 167–68, 94 S.Ct. 2140.

The Supreme Court reversed, holding that the plaintiffs were required to bear the cost of notice to the class because it found "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. 2140. Additionally, the Court reasoned that a preliminary inquiry into the merits was improper because it would provide the plaintiffs with a determination on the merits "without any assurance that a class action may be maintained," and might "color the subsequent proceedings," and "place an unfair burden on the defendant." *Id.* at 177–78, 94 S.Ct. 2140.

As an analysis of *Eisen* shows, however, the issue concerned a "preliminary inquiry into the merits" for purposes of the apportionment of the cost of notice rather than a determination of the Rule 23 requirements. However, the statement "has led some courts to think that in determining whether any Rule 23 requirement is met, a judge may not consider any aspect of the merits, and has led other courts to think that a judge may not do so at least with respect to a prerequisite of Rule 23 that overlaps with an aspect of the merits of the case." *In re IPO Sec. Litig.*, 471 F.3d at 33. *See, e.g., Alba v. Papa John's USA, Inc.*, 2007 WL 953849, at *5 (C.D.Cal. Feb.7, 2007) ("In deciding a motion to certify a class, the court may not evaluate whether the plaintiff is likely to prevail on the merits of the stated claims.") (citing *Eisen*, 417 U.S. at 177–78, 94 S.Ct. 2140.)

The Supreme Court further addressed Rule 23 requirements in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Supreme Court explained that "[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. 2364. The Supreme Court also stated that "actual, not presumed, conformance with Rule 23(a) remains ... indispensable." *Id.* at 160, 102 S.Ct. 2364. Finally, the Supreme Court observed that "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). The Court concluded that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* Therefore, several propositions can be gleaned from *Gen. Tel. Co.*: (1) class certification required a "rigorous analysis," (2) a court may not simply presume conformance with the Rule 23 requirements, and (3) a court may sometimes need to look beyond the pleadings in determining the certification issue. However, the import of the Supreme Court's statement that a class determination involves considerations "enmeshed in the factual and legal issues" is unclear and has been interpreted in disparate ways by the lower courts. *See In re IPO Sec. Litig.*, 471 F.3d at 33.

### 3. Treatment by the Ninth Circuit prior to 2007

In *Blackie v. Barrack*, the Ninth Circuit established its standard concerning a district court's evaluation of the Rule 23 factors:

The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements.

524 F.2d 891, 901 n. 17 (9th Cir.1975). The Ninth Circuit also cited *Eisen* even though *Blackie* involved a determination of the Rule 23 requirements rather than the apportionment of the cost of providing notice to class members:

The Court made clear in *Eisen* [ ] that that determination does not permit or require a preliminary inquiry into the merits, 417 U.S. at 177–178[, 94 S.Ct. 2140]; thus the district judge is necessarily bound to some degree of speculation by the uncertain state of the record on which he must rule. An extensive evidentiary showing of the sort requested by defendants is not required. So long as he has sufficient material before him to determine the nature of the allegations, and rule on compliance with the Rule's requirements, and he bases his ruling on that material/his approach cannot be faulted because plaintiffs' proof may fail at trial.

*Id.* at 901.

*Blackie* provides little guidance on whether a district court may resolve factual disputes in determining whether the Rule 23 requirements are satisfied.[10] Some of *Blackie*'s lan-

---

**10.** If evidence is not in dispute, the Court is permitted to rely on evidence submitted by the defendant even if such evidence also relates to the merits of the case. In *Hanon v. Dataproducts Corp.*, the Ninth Circuit denied certification because it determined that the class plaintiff failed to satisfy the typicality requirement of Rule 23(a). 976 F.2d 497, 509 (9th Cir.1992). The Ninth Circuit reasoned that the class plaintiff was not typical because his "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses

which may be raised against other members of the proposed class." *Id.* at 508.

The Ninth Circuit emphasized that the unique defenses to which the class plaintiff was susceptible were "not a basis for denial of class certification." *Id.* at 509 (citing *Blackie*, 524 F.2d at 901 n. 17; *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 22 (N.D.Cal.1986)). However, the Court also explained that "we are 'at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case.'"

guage suggests that a district court may not resolve factual disputes. For example, *Blackie* mandates that a district court take the factual allegations as true. *Id.* at 901 n. 17. Such an inference seems to bar a district court from resolving factual disputes against the plaintiff so long as the plaintiff has alleged sufficient facts to create a dispute.[11] Additionally, *Blackie* precludes a district court from putting a plaintiff "to preliminary proof of his claim." *Id.* Finally, *Blackie* cites *Eisen* for the proposition that a court may not make a preliminary inquiry into the merits. *Id.* at 901. This extension of *Eisen* beyond the notice context suggests that the Ninth Circuit intended to preclude a weighing of evidence at the class certification stage.

However, other language in *Blackie* suggests the opposite conclusion. *Blackie* states that a motion for class certification requires "sufficient information to form a reasonable judgment." *Id.* at 901 n. 17. A judge is permitted to request supplemental material so that an "informed judgment" may be made. *Id.* While an "extensive evidentiary showing" is not required, the district court may "rule on compliance" and base its ruling on the supplemental material. *Id.* at 901. The use of the phrases "ruling based on that material," "informed judgment," and "reasonable judgment" suggest that a district court may make a factual determination when the pleadings have been supplemented with additional material. Additionally, a request for supplemental material would be meaningless if the court were precluded from making factual determinations concerning these submissions. Therefore, the Court concludes that *Blackie* is ambiguous as to whether a court may resolve factual disputes in determining whether the Rule 23 requirements are satisfied.

The Court recognizes the hundreds of courts that have cited *Blackie's* language concerning motions for class certification. Most courts simply quote a substantial portion of the two paragraphs but do not attempt to resolve the issue discussed above. *See, e.g., L.H. v. Schwarzenegger*, 2007 WL 662463, at *13 (E.D.Cal. Feb.28, 2007); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 231 (C.D.Cal.2003); *Levine v. SkyMall, Inc.*, 2002 WL 31056919, at *2–3 (D.Ariz. May 24, 2002); *Joyce v. City and County of San Francisco*, 1994 WL 443464, at *3 (N.D.Cal. Aug.4, 1994); *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D.Cal. 1985); *Schwartz v. Harp*, 108 F.R.D. 279, 280 (C.D.Cal.1985). Other courts have reworded *Blackie*, but refrained from deciding whether a court may resolve factual disputes. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir.1982) ("Although in determining whether to certify the class, the district court is bound to take the substantive allegations of the complaint as true, the court is also required to consider the nature and range of proof necessary to establish those allegations."); *Nat'l Fed'n of the Blind v. Target Corp.*, 2007 WL 1223755, at *3 (N.D.Cal. Apr.25, 2007) ("However, in adjudicating a motion for class certification the court accepts the allegations in the complaint as true so long as those allegations are sufficiently specific to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied."); *Kirkpatrick v. Ironwood Communications, Inc.*, 2006 WL 2381797, at *3 (W.D.Wash. Aug.16, 2006) ("The court may assume the truth of Plaintiffs' substantive allegations, but should consider extrinsic evidence regarding whether the action is appropriate to treat as a class."); *Rogers v. NationsCredit Fin. Servs. Corp.*, 233 B.R. 98, 102–103 (N.D.Cal.1999) ("Not-

---

*Id.* (quoting *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D.Cal.1985)).

**11.** The Ninth Circuit's reference to "substantive allegations" could be read as referring to the allegations relating to the substantive claims rather than allegations concerning the Rule 23 requirements. The Court recognizes that courts in this Circuit have almost uniformly interpreted "substantive allegations" as referring to allegations concerning the Rule 23 requirements. *See,*

e.g., *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 1991529, at *2 (N.D.Cal. June 30, 2007); *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 509 (N.D.Cal.2007); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D.Cal.2007); *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 991 (C.D.Cal.2006); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D.Cal. 2006).

withstanding the general prohibition against examining the merits, some canvassing of the facts is permissible."); *Schwartz v. Upper Deck Co.* 183 F.R.D. 672, 681 (S.D.Cal.1999) ("Reasonable judgments cannot be made out of thin air; sufficient information to make such a judgment is a required preliminary step.").

One of the few decisions to address whether a court may resolve factual disputes is *Osmer v. Aerospace Corp.*, 1982 WL 488, at *1 (C.D.Cal. Oct.20, 1982). In *Osmer*, the plaintiff alleged that the defendant applied certain discriminatory policies on a class-wide basis. 1982 WL 488, at *2. The plaintiff submitted affidavits and statistical studies based on a regression analysis of data "on employee advancement and salary." *Id.* at *2 n. 2. Defendant submitted declarations "asserting that plaintiff's expert opinion is statistically unsound, that management level personnel made their decisions in a non-discriminatory manner, and affidavits of various female employees who claim they were not held back by any policy of defendant." *Id.* at *4. The Court held that "[t]aking the representations alleged by plaintiff in the complaint, and the statistical proof offered, along with the affidavits, the plaintiff has presented common questions capable of resolution in the context of a class suit." *Id.* The Court observed that it was not ruling "on' whether the contrary affidavits of defendant are sufficient to prevail on the merits ... [but instead] that, under the test mandated by *Blackie*, 524 F.2d at 901, the plaintiff has shown that questions of fact which would be common to the whole class are presented by the pleadings and material submitted." *Id.*

### 4. Dukes v. Wal–Mart

The Ninth Circuit recently issued an opinion which may have resolved the uncertainty discussed above. In *Dukes v. Wal–Mart, Inc.*, female Wal–Mart employees alleging sex discrimination brought a Title VII class action against Wal–Mart. 474 F.3d 1214 (9th Cir.2007). The district court certified the class for certain of plaintiffs' claims and the Ninth Circuit affirmed. *Id.*

One of the principal issues raised by Wal–Mart on appeal was whether the plaintiffs had satisfied Rule 23(a)(2)'s commonality requirement by presenting evidence that Wal–Mart engaged in discriminatory practices that affected all plaintiffs in a common manner. *Id.* at 1225. To establish commonality, plaintiffs submitted factual evidence, expert opinions, expert statistical evidence, and anecdotal evidence. *Id.* For example, plaintiffs' expert sociologist explained that "Wal–Mart has and promotes a strong corporate culture—a culture that may include gender stereotyping." *Id.* at 1226. Plaintiffs' expert concluded "(1) that Wal–Mart's centralized coordination, reinforced by a strong organizational culture, sustains uniformity in personnel policy and practice; (2) that there are significant deficiencies in Wal–Mart's equal employment policies and practices; and (3) that Wal–Mart's personnel policies and practices make pay and promotion decisions vulnerable to gender bias." *Id.*

Wal–Mart argued that the expert's third conclusion was vague, imprecise, and failed to satisfy *Daubert*. However, the district court rejected Wal–Mart's argument, explaining that Wal–Mart's challenges " 'are of the type that go to the weight, rather than the admissibility, of the evidence.' " *Id.* at 1227 (quoting *Dukes v. Wal–Mart, Inc.*, 222 F.R.D. 189, 191–92 (N.D.Cal.2004)). The Ninth Circuit agreed, explaining that "[t]he district court was on very solid ground here as it has long been recognized that arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage." *Id.* (citing *Eisen*, 417 U.S. at 177, 94 S.Ct. 2140 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Selzer v. Bd. of Educ. of City of New York*, 112 F.R.D. 176, 178 (S.D.N.Y. 1986) ("A motion for class certification is not the occasion for a mini-hearing on the merits.")). The Ninth Circuit also stated that "courts need not apply the full *Daubert* 'gatekeeper' standard at the class certification stage." 474 F.3d at 1227. "Rather, 'a lower *Daubert* standard should be employed at this [class certification] stage of the proceedings.' " *Id.* (quoting *Thomas & Thomas*

*Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,* 209 F.R.D. 159, 162 (C.D.Cal.2002)).

Similarly, Plaintiffs' expert statistician presented statistical evidence of class-wide discrimination based on data collected at a regional level. 474 F.3d at 1228. Wal–Mart claimed that "the district court erred by not finding Wal–Mart's statistical evidence more probative than Plaintiffs' evidence because, according to Wal–Mart, its analysis was conducted store-by-store" rather than at a regional level. *Id.* at 1229. The Ninth Circuit rejected Wal–Mart's argument that class certification should not have been granted because 6 Wal–Mart's statistical evidence was more probative:

> [O]ur job on this appeal is to resolve whether the "evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive" to the trier of fact. *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001). Thus, it was appropriate for the court to avoid resolving "the battle of the experts" at this stage of the proceedings. *See Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 292–93 (2d Cir.1999) (noting that a district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts).

474 F.3d at 1229.

Thus, *Dukes* appears to have established three propositions. First, the *Dukes* majority explains that challenges to expert opinions constitute merits determinations that go to the weight of the evidence rather than admissibility. *Id.* at 1227. Thus, a district court is not permitted to discount the testimony of a plaintiff expert merely because the defendant has challenged some aspect of the expert's opinion. *Id.*

Second, *Dukes* extended the holding of *Eisen* to determinations involving Rule 23 requirements. *Id.* As discussed above, numerous courts have extended *Eisen* beyond its original holding, including the Ninth Circuit in *Blackie.*

Finally, the *Dukes* majority held that a court may not weigh conflicting evidence in determining whether the Rule 23 requirements are satisfied. *Id.* at 1229. Where both plaintiffs and defendants have proffered expert testimony, the court must avoid resolving a "battle of the experts" in a motion for class certification. *Id.* Therefore, at a minimum, *Dukes* establishes that a court may not resolve factual conflicts concerning expert opinions in a motion for class certification. Read more broadly, *Dukes* could be interpreted as holding that a district court may not resolve any factual disputes in determining whether the Rule 23 requirements are satisfied.

Such a reading of *Dukes* is essentially required in light of *Dukes'* reliance on the Second Circuit cases of *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283 (2d Cir.1999) and *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124 (2d Cir. 2001).

### a. Caridad

In *Caridad,* present and former employees of the defendant brought a Title VII race discrimination action. 191 F.3d at 286. The plaintiffs sought to certify a class consisting of current and former African–American employees of Metro–North. *Id.* To establish commonality, plaintiffs submitted numerous statistical analyses which were analyzed by the plaintiffs' expert. *Id.* at 288. Based on an analysis of company-wide statistics, the plaintiffs' expert concluded that the Metro–North's company-wide policies for discipline and promotion were exercised in a discriminatory manner. *Id.*

Metro–North's expert, Dr. Evans, criticized the conclusions of plaintiff's expert. *Id.* Specifically, Dr. Evans argued that the plaintiffs' expert's analysis was flawed because it was conducted on a company-wide basis rather than a position-by-position basis. *Id.* For example, Dr. Evans noted that out of the thirty-seven different departments at the employer, no disciplinary action was taken in twenty-five of the departments. *Id.* Additionally, Dr. Evans explained that there was significant variation in discipline from job to job within those departments where disciplin-

ary action was taken. *Id.* Dr. Evans pointed out similar flaws regarding plaintiffs' expert's analysis of promotions. *Id.* at 289. Therefore, Dr. Evans concluded that "'an organization-wide pattern and practice of discrimination is ... implausible'" and the plaintiffs were "'at best, typical of only a fraction of the [defendant's] workforce.'" *Id.* at 288.

Relying on the analysis of Dr. Evans, the district court denied class certification. *Id.* at 289–90. The Second Circuit reversed and criticized the district court's reliance on Dr. Evans:

> The District Court relied on the report of Metro–North's statistical expert, Dr. Evans, to conclude that the Class Plaintiffs' statistics were inadequate because they failed to take into account the fact that various Metro–North positions have materially different rates of discipline and promotion. Though Metro–North's critique of the Class Plaintiffs' evidence may prove fatal at the merits stage, the Class Plaintiffs need not demonstrate at this stage that they will prevail on the merits. Accordingly, this sort of "statistical dueling" is not relevant to the certification determination. *See, e.g., Krueger v. New York Telephone Company,* 163 F.R.D. 433, 440–41 (S.D.N.Y.1995). We conclude that the Class Plaintiffs' statistical evidence supports a finding of commonality on the issue of discipline with respect to those African–American employees who were disciplined while working in one of the 48 positions in which African–Americans are more likely to be disciplined than Whites. In addition, the statistical evidence supports a finding of commonality on the promotion claim. The Class Plaintiffs submitted evidence that tends to establish that being Black has a statistically significant effect on an employee's likelihood of being promoted; indeed, being Black reduces an employee's likelihood of promotion by approximately 33 percent. In conducting her analyses, the Class Plaintiffs' expert controlled for various factors that one would expect to be relevant to the likelihood of disciplinary action and promotion. These statistical disparities are not insignificant. *Cf. Watson v. Fort Worth Bank and Trust,* 487

U.S. 977, 994–95, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, *see Wards Cove Packing Company v. Atonio,* 490 U.S. 642, 650–55, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), but this report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification.

*Id.* at 292–93.

The Ninth Circuit explicitly relied on *Caridad* in concluding that a court may not resolve a "battle of the experts" at the class certification stage. *Dukes,* 474 F.3d at 1229. Therefore, *Dukes* establishes that the court may not weigh evidence from Defendants' expert against evidence from Plaintiffs' expert in determining whether the Rule 23 requirements are satisfied.

### b. Visa Check

In *In re Visa Check/MasterMoney Antitrust Litig.,* various retailers, merchants, and retail associations brought an antitrust action against defendants Visa and MasterCard. 280 F.3d at 129. The plaintiffs alleged that the defendants had created a tying arrangement in violation of the Sherman Act by requiring stores accepting their credit cards to also accept their debit cards. *Id.* at 129–30. Plaintiffs sought to certify a class consisting of "'all persons and business entities who have accepted Visa and/or MasterCard credit cards and therefore are required to accept Visa Check and/or MasterMoney debit cards under the challenged tying arrangements.'" *Id.* at 131.

Plaintiffs' expert, Dr. Carlton, asserted that a large number of retailers would have refused to accept Visa Check and MasterMoney in the absence of the alleged tying arrangement. *Id.* at 133. Carlton reasoned that the defendants would have lowered interchange fees in response. *Id.* Thus, Carlton concluded that consumers paid higher interchange fees than they would have absent the tying arrangement. *Id.*

Defendants' expert asserted that "Carlton's model of how the debit card market would operate absent the alleged tie did not

adequately take into account [several] consequences that would have accompanied the cessation of the tie." *Id.* at 134. Relying on Carlton's report, the district court granted plaintiffs' motion for class certification. *Id.* at 132.

On appeal, defendant argued that "the district court erroneously relied on Carlton's report in granting plaintiffs' class certification motion because, according to defendants, the district court improperly limited its scrutiny of the report and Carlton's expert opinion 'failed to provide a credible basis for class certification.'" *Id.* at 134. The Second Circuit rejected defendants' criticism of plaintiffs' expert and held that so long as the expert's methodology was not "fatally flawed," such methodology "was sufficiently reliable for class certification purposes." *Id.* at 135. The Second Circuit's conclusion was based on its reasoning that a court may not examine the merits at the class certification stage:

> Defendants contend that the district court erroneously relied on Carlton's report in granting plaintiffs' class certification motion because, according to defendants, the district court improperly limited its scrutiny of the report and Carlton's expert opinion "failed to provide a credible basis for class certification." Although a trial court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class, "a motion for class certification is not an occasion for examination of the merits of the case." *Caridad,* 191 F.3d at 291 (internal quotation marks omitted). A district court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law. *See Cruz v. Coach Stores, Inc.,* No. 96 Civ. 8099, 1998 WL 812045, at *4 n. 3 (S.D.N.Y. Nov.18, 1998) (disregarding expert report submitted in support of motion for class certification because the report was "fatally flawed"), *aff'd in part, vacated in part on other grounds,* 202 F.3d 560, 573 (2d Cir.2000) ("[Plaintiff] has not shown that the court abused its discretion in finding the report methodologically flawed."); *accord In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 91 (S.D.N.Y.1998) (granting

class certification upon finding that "plaintiffs' econometric methodologies have a reasonable probability of establishing" plaintiffs' claims by common proof); *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 531–32 (S.D.Fla.1996) (granting class certification upon finding that "Plaintiffs have demonstrated at least a 'colorable method' of proving [common injury] at trial"); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 687 (D.Minn.1995) (stating that "in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all"). However, a district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts. *Caridad,* 191 F.3d at 292–93. The question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive. *Id.* at 292–93.

To the extent that defendants' contention is that the court did not sufficiently examine whether Carlton's methodology was fatally flawed, and thus inadmissible even for class certification purposes, we reject this argument as meritless. The district court, in an almost fifty page opinion, thoroughly considered each of defendants' criticisms of Carlton's theory and Carlton's response to each of those criticisms and concluded in each case that Carlton's response sufficiently addressed the criticism. The district court correctly noted that its function at the class certification stage was not to determine whether plaintiffs had stated a cause of action or whether they would prevail on the merits, but rather whether they had shown, based on methodology that was not fatally flawed, that the requirements of Rule 23 were met. *In re Visa Check/MasterMoney Antitrust Litig.,* 192 F.R.D. [68] at 76, 79 [(E.D.N.Y.2000)]. As for defendants' claim that plaintiffs' expert evidence failed to provide a reliable basis for class certification, the district court's finding that Carlton's methodology

was not fatally flawed, and therefore, was sufficiently reliable for class certification purposes, does not constitute an abuse of its discretion.

*Id.* at 134–35.

The Ninth Circuit explicitly relied on *In re Visa Check/MasterMoney Antitrust Litig.* in concluding that a court should determine whether " 'evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive' to the trier of fact." *Dukes,* 474 F.3d at 1229 (quoting *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 135). Even if *Dukes* does not implicitly adopt the "fatal flaw" standard, its reliance on *In re Visa Check/MasterMoney Antitrust Litig.* establishes that the court cannot deny a motion for class certification simply because experts disagree over the proper methodology.

### c. *In re Initial Public Offerings Sec. Litig.*

The Ninth Circuit's reliance on *Caridad* and *In re Visa Check/MasterMoney Antitrust Litig.* is particularly significant because these cases were overruled by the Second Circuit prior to *Dukes.* In *In re IPO Sec. Litig.,* plaintiffs brought class action securities fraud lawsuits against some of the nation's largest underwriters in connection with a series of initial public offerings. 471 F.3d 24, 27 (2d Cir.2006). The district court granted plaintiffs' motions for class certification in six "focus cases." *Id.*

The Second Circuit determined that the "appeal primarily concerns the issue ... as to what standards govern a district judge in adjudicating a motion for class certification." *Id.* at 26. First, the Second Circuit examined the Supreme Court cases discussed above as well as Second Circuit precedent.

*Id.* at 32–37. Next, the Second Circuit overruled *Caridad* and *In re Visa Check/MasterMoney Antitrust Litig.* with respect to their standards for class certification:

> [W]e can no longer continue to advise district courts that "some showing," *Caridad,* 191 F.3d at 292, of meeting Rule 23 requirements will suffice ... or that an expert's report will sustain a plaintiff's burden so long as it is not "fatally flawed," *see Visa Check,* 280 F.3d at 135. . . .

471 F.3d at 40.[12]

The Second Circuit clarified that a district court must make factual findings to the extent such findings are necessary to determine if a requirement is met:

> It would seem to be beyond dispute that a district court may not grant class certification without making a determination that all of the Rule 23 requirements are met. We resist saying that what are required are "findings" because that word usually implies that a district judge is resolving a disputed issue of fact. Although there are often factual disputes in connection with Rule 23 requirements, and such disputes must be resolved with findings, the ultimate issue as to each requirement is really a mixed question of fact and law. A legal standard, e.g., numerosity, commonality, or predominance, is being applied to a set of facts, some of which might be in dispute. The Rule 23 requirements are threshold issues, similar in some respects to preliminary issues such as personal or subject matter jurisdiction. We normally do not say that a district court makes a "finding" of subject matter jurisdiction; rather, the district court makes a "ruling" or a "determination" as to whether such jurisdiction exists. The judge rules either that jurisdiction exists or that it does not. Of course, in making such a ruling, the judge

---

**12.** The Court overruled *Caridad* and *In re Visa Check/MasterMoney Antitrust Litig.* more explicitly later in the opinion:

> [O]ur conclusions necessarily preclude the use of a "some showing" standard, and to whatever extent *Caridad* might have implied such a standard for a Rule 23 requirement, that implication is disavowed. Second, we also disavow the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule

23 requirement simply by being not fatally flawed.

471 F.3d at 42. Additionally, Judge Newman points out that as the author of both *In re Initial Public Offering Sec. Litig.* and *Caridad,* he "welcome[s] the opportunity to acknowledge the shortcomings of [*Caridad's*] language and to participate with the panel in the pending case in providing needed clarification." 471 F.3d at 35 n. 6.

often resolves underlying factual disputes, and, as to these disputes, the judge must be persuaded that the fact at issue has been established. The same approach is appropriate for Rule 23 requirements. For example, in considering whether the numerosity requirement is met, a judge might need to resolve a factual dispute as to how many members are in a proposed class. Any dispute about the size of the proposed class must be resolved, and a finding of the size of the class, e.g., 50, 100, or more than 200, must be made. At that point, the judge would apply the legal standard governing numerosity and make a ruling as to whether that standard, applied to the facts as found, establishes numerosity.

*Id.* at 40.

Finally, the Second Circuit held that a court must make requirement determinations even if such determinations overlap with merits issues:

The more troublesome issue arises when the Rule 23 requirement overlaps with an issue on the merits. With *Eisen* properly understood to preclude consideration of the merits only when a merits issue is unrelated to a Rule 23 requirement, there is no reason to lessen a district court's obligation to make a determination that every Rule 23 requirement is met before certifying a class just because of some or even full overlap of that requirement with a merits issue. We thug align ourselves with *Szabo*, *Gariety*, and all of the other decisions discussed above that have required definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues. As *Gariety* usefully pointed out, the determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts, even if that trier is the class certification judge. 368 F.3d at 366.

471 F.3d at 41.[13]

Therefore, the Second Circuit concluded "(1) that a district judge may not certify a class without making a ruling that each Rule 23 requirement is met and that a lesser standard such as 'some showing' for satisfying each requirement will not suffice, (2) that all of the evidence must be assessed as with any other threshold issue, (3) that the fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met, although such a circumstance might appropriately limit the scope of the court's inquiry at the class certification stage." *Id.* at 27.

The Second Circuit observed that its conclusions were consistent with the conclusions of the case law in most of the Circuits. For example, in *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001), Judge Easterbrook explained that "a judge should make whatever factual and legal inquiries are necessary under Rule 23." Judge Easterbrook also stated that "the judge would receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class." *Id.* The Third, Fourth, and Fifth Circuits have all followed *Szabo*. *Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 366 (4th Cir.2004) (relying on *Szabo); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir.2001) (relying on *Szabo); Unger v. Amedisys, Inc.,* 401 F.3d 316, 322–23 (5th Cir.2005) (relying on *Gariety).* Similarly, the Eighth Circuit has held that "in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case . . . [including] the resolution of expert disputes concerning the import of evidence," *Blades v. Monsanto Co.,* 400 F.3d 562, 575 (8th Cir.2005), and the Eleventh Circuit has stated that

[w]hile it is true that a trial court may not properly reach the merits of a claim when determining whether class certification is warranted, this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors? necessary to a reasoned determination of

---

**13.** The Second Circuit provided that "[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation, a district judge must be accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements." 471 F.3d at 41.

whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements.

*Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984) (citation omitted).[14]

If this Court were free to craft its own standard, it would follow the standard established by *In re IPO Sec. Litig.* The Court finds the reasoning of *IPO* persuasive and consistent with the views of nearly every other Circuit. However, as discussed in Part IV, for purposes of the MDL this Court is only bound by Ninth Circuit precedent. A plain reading of *Dukes,* coupled with *Dukes'* reliance on standards articulated by the overruled *Caridad* and *In re Visa Check/Master-Money Antitrust Litig.* decisions rather than *In re IPO Sec. Litig.* (or a decision from any other Circuit), clearly demonstrates that the Ninth Circuit intended to prohibit district courts from weighing conflicting evidence when determining whether the Rule 23 requirements are satisfied.[15]

### 5. Post–Dukes Caselaw

Although the opinion in *Dukes* was issued only six months ago at least one district court has interpreted *Dukes* similarly to this court. In *L.H. v. Schwarzenegger,* 2007 WL 662463, at *1 (E.D.Cal. Feb.28, 2007), plaintiff juvenile parolees in California alleged that California has a policy and practice of denying class members with disabilities their statutory rights under the Americans with Disabilities Act. The defendants argued that the class plaintiffs were not in fact disabled, and therefore neither of the plaintiffs satisfied the typicality requirement. *Id.* at *12. In support of their position, the defendants submitted educational records of the plaintiffs. *Id.*

First, the district court noted that "although the allegations in the complaint must be taken as true for the purposes of class certification ... the court is 'at liberty' to consider evidence that relates to the merits if such evidence also goes to the requirements of Rule 23." *Id.* at *10. However, the district court went on to reject the defendants' argument that the plaintiffs were not typical because the plaintiffs were not in fact disabled. *Id.* at *12. The court explained that "arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage" and "plaintiffs need only provide sufficient information for the court to form a reasonable judgment about whether plaintiffs' claims are typical." *Id.* at *12–13 (quoting *Dukes,* 474 F.3d at 1227). The court concluded that "[i]n examining the allegations set forth in the complaint, as well as the evidence submitted by both plaintiffs and defendants, the court finds that there is sufficient information to conclude that plaintiffs' claims are typical of the class." *Id.*

Therefore, under one reading of *Dukes,* the scope of the Court's analysis is so limited that certification is virtually inevitable. Review of a motion for class certification would be similar to review of a Rule 12(b)(6) motion because class certification would be granted so long as the Plaintiffs submitted expert testimony in support of each of the Rule 23 requirements. Much of the analysis detailed in the remainder of the opinion would be irrelevant under such a standard.

While *Dukes* may impose such a restricted review, *Dukes* possibly permits a limited inquiry that still allows the Court—without too much probing—to examine Plaintiffs' Rule 23 showing.[16] Therefore, the Court proceeds

---

**14.** Although the First Circuit does not appear to have definitely addressed this issue, it appears to have adopted an approach consistent with the majority view. *In re IPO Sec. Litig.,* 471 F.3d at 39. In a securities fraud class action, the First Circuit stated that "[t]he question of how much evidence of efficiency is necessary for a court to accept the fraud-on-the-market presumption of reliance at the class-certification stage is ... one of degree." *In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 17 (1st Cir.2005).

**15.** In his dissent, Judge Kleinfeld relied on *In re IPO Sec. Litig.* in setting forth his standard for

class certification: "as the Second Circuit recently held in *In re IPO,* a district judge considering class certification must make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues' and 'must receive enough evidence, by affidavits, documents or testimony, to be satisfied that each Rule 23 requirement has been met.'" 474 F.3d at 1245 (Kleinfeld, J., dissenting) (quoting *In re IPO Sec. Litig.,* 471 F.3d at 41).

**16.** For example, *Dukes* cited *Visa Check* with approval, and *Visa Check* held that an expert's methodology was sufficient for class certification

with a more detailed analysis to determine whether Plaintiffs have satisfied Rule 23.[17]

### C. Application of Rule 23(a) Factors

Rule 23(a) provides that a class member may sue as a representative party on behalf of all class members if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). The plaintiff has the burden of establishing that all four factors are satisfied. *In re N. Dist. of Cal., Dalkon Shield IUD, Prods. Liability Litig.,* 693 F.2d 847, 854 (9th Cir.1982) (citing *Doninger v. Pac. Northwest Bell, Inc.,* 564 F.2d 1304, 1308–09 (9th Cir.1977)).

### 1. The Class is So Numerous that Joinder of All Class Members Is Impracticable

█ The first requirement of Rule 23(a) is that the class be so numerous that joinder of all members individually would be impracticable. Fed.R.Civ.P. 23(a)(1). The Supreme Court has cautioned that "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Comm'n,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Moreover, "the absolute number of class members is not the sole determining factor in whether joinder will be impracticable." *Buttino v. Fed. Bureau of Investigation,* 1992 WL 12013803, at *1 (N.D.Cal. Sept.25, 1992). *Hum v. Dericks,* 162 F.R.D. 628, 634 (D.Hawai'i 1995) ("There is no magic number for determining when too many parties make joinder impracticable.").

The Supreme Court has held that a class of fifteen is too small to satisfy the numerosity requirement. *General Tel. Co. v. EEOC,*

446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). However, some courts have found the numerosity requirement satisfied when the class comprises as few as 40 members. *See, e.g., Ansari v. New York Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998); *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). The Ninth Circuit has noted that classes with fewer than 70 members have been certified in numerous cases. *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1320 n. 10 (9th Cir.1982), *vacated on other grounds,* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982) (noting that classes with fewer than 70 members have been certified in numerous cases).

In each of the five class actions, the Plaintiff alleges that there are thousands of class members in the relevant region that are geographically dispersed. (Riley Compl. ¶ 52); (Thompson Compl. ¶ 52); (Hammer Compl. ¶ 52); (MacLaughlan Compl. ¶ 52); (Young Compl. ¶ 52). Defendants do not contest Plaintiffs' allegation that there are thousands of purchasers of rock concert tickets. Instead, Defendants argue that the class is not ascertainable because "rock" cannot be defined. Regardless of how the market is defined, the class will consist of thousands of individuals. For example, even if the each concert were defined as a single market, the class would still consist of the thousands of class members who attended that concert. Therefore, the numerosity requirement is satisfied.

### 2. Are There Questions of Law or Fact Common to the Class?

█ Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). The Ninth Circuit has explained that "All questions of fact and law need not be common to satisfy the rule ... shared legal

purposes so long as it was not "fatally flawed." 280 F.3d at 135.

**17.** Even under this more searching review, *Dukes* clearly precludes the Court from conducting a *Daubert* analysis or weighing expert testimony.

issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* "The commonality test is qualitative rather than quantitative—one significant issue common to the class may be sufficient to warrant certification." *Dukes v. Wal–Mart, Inc.,* 474 F.3d 1214, 1225 (9th Cir.2007). Common questions of law or fact alleged by Plaintiffs include:

1. Whether the relevant market consists of the market for the sale of tickets to live rock concerts in the [relevant] region;

2. Whether Defendants have monopolized and attempted to monopolize the relevant market;

3. Whether Defendants intentionally and unlawfully excluded competitors and potential competitors from the relevant market;

4. Whether Defendants' unlawful conduct caused Plaintiff and the Class members to pay more for concert tickets than they otherwise would have paid;

5. Whether Plaintiff and members of the Class are entitled to declaratory, equitable and/or injunctive relief; and

6. Whether Plaintiff and the Class have been damaged and the amount of such damages.

(Riley Compl. ¶ 55.)

Although Defendants argue that Plaintiffs cannot satisfy the requirements of Rule 23(a)(2), Defendants conflate this analysis with their Rule 23(b)(3) analysis. (Def.'s Opp. at 11.) Regardless, the Court finds that Plaintiffs have demonstrated substantial shared legal issues and the existence of a common core of salient facts. *See* Part V.D (examining common issues such as market definition, monopoly power, anticompetitive conduct, and casual antitrust injury). Therefore, Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### 3. Are the Claims or Defenses of the Representative Parties Typical of the Claims or Defenses of the Class?

■ The "claims or defenses of the class representative must be 4 typical of the claims or defenses of the class." Fed.R.Civ.P.

23(a)(3). The Ninth Circuit has explained that Rule 23(a) is satisfied "if [Plaintiffs'] situations share a 'common issue of law or fact,' and are 'sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" *CRLA v. Legal Services Corp.,* 917 F.2d 1171, 1175 (9th Cir.1990) (citing *Blackie,* 524 F.2d at 904). Plaintiffs' injuries may be typical even if the amount of injury is different from other class members, *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992) or if other class members suffered their injury at a different time. *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). Plaintiffs' claim may not be typical where their claim is subject to a unique defense that could not be asserted against other members of the class. *Ross v. Bank South, N.A.,* 837 F.2d 980, 990 (11th Cir.1988).

The class representatives' claims are not only typical, but virtually identical with the rest of the class members. The representatives' and class members' claims all arise from the same course of conduct—Clear Channel's alleged monopolization and anticompetitive practices in the rock concert market—and all of the Plaintiffs seek identical relief.

However, Defendants contend that the ticket price for each concert is the result of a unique negotiation between the artist and the promoter. (*Id.*) As a result, Defendants assert that "the named Plaintiffs' proof that they were overcharged for the concerts they attended would not prove that absent class members were overcharged for the different concerts they attended." (*Id.*) Therefore, Defendants conclude that "the named Plaintiffs' claims are not typical of the proposed class." (*Id.*)

In essence, Defendants contend that some class members may have been injured and some class members may not have been injured. As a result, Defendants seem to contend that some potential class members are unlikely to recover because of a unique defense. However, the fact that some prospective plaintiffs may ultimately fail to prove damages once the merits are considered is not relevant to typicality. If Defendants are correct that each concert must be individual-

ly examined in order to determine how the ticket price was negotiated, this is potential defense common to *all* of the claims. Thus, while Defendants' argument may relate to whether individual issues will predominate, *see* Section V.D, typicality is unaffected. Therefore, the Court holds that the representatives' claims are typical of the claims of the rest of the class members.

### 4. Will the Representative Parties Fairly and Adequately Protect the Interests of the Class?

■ Under Rule 23(a)(4), the named representative must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel," *Dukes,* 474 F.3d at 1233. *See also Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir.2003) (same); *In re Mego Fin. Corp. Litig.,* 213 F.3d 454, 462 (9th Cir.2000) (same); *Hanlon,* 150 F.3d at 1020. Occasionally the Ninth Circuit divides these two 28 questions down into four components: 1) qualifications of counsel for the representatives; 2) absence of antagonism; 3) sharing of interests between representatives and absentees; and 4) unlikelihood that the suit is collusive. *See Molski v. Gleich,* 318 F.3d 937, 955 (9th Cir.2003); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir.2001); *Walters v. Reno,* 145 F.3d 1032, 1046 (9th Cir.1998). None of these cases impose a knowledge requirement on the part of the class representatives, and the Court cannot locate any other Ninth Circuit decision imposing such a requirement.

However, relying on Fifth Circuit cases, Defendants argue that Rule 23(a)(4) requires that the class representatives possess heightened knowledge about the case. (Def.'s Opp. at 20–21) (citing *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 482–83 (5th Cir.2001); *Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 484 (5th Cir.1982)). Specifically, Defendants contend that Rule 23(a)(4) imposes a three part inquiry: (1) whether the class

representatives "know more than that they were involved in a bad business deal," (2) whether the class representatives' knowledge of the case is "limited to derivative knowledge acquired solely from counsel," and (3) whether the class representatives are willing and able to "take an active role in and control and to protect the interests of absentees." (Def.'s Opp. at 20–21) (quoting *Berger,* 257 F.3d at 482–83).

Even if the Court were to consider these Fifth Circuit cases, *Berger* is clearly inapplicable to this case. In *Berger,* the plaintiffs alleged violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934. 257 F.3d at 477. The Fifth Circuit held that the PSLRA raised the "adequacy" threshold for class representatives by imposing a knowledge requirement on the representatives. *Berger,* 257 F.3d at 483. The Fifth Circuit explained:

> Any lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the PSLRA's requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation. In this way, the PSLRA raises the standard adequacy threshold.

*Id.* at 483 (emphasis added). The Fifth Circuit concluded that "in complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly. Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." *Id.* at 484. Therefore, it appears that *Berger's* heightened requirement for knowledge only applies to securities fraud class actions.

With respect to *Horton,* the Fifth Circuit did not require more than a basic knowledge of the case because the court deemed the proposed class representative as adequate because he was familiar with the complaint and the concept of a class action lawsuit. *Horton,* 690 F.2d at 484. While the Court is not bound to follow *Horton,* some district courts within the Ninth Circuit have stated that the knowledge of the class representa-

tives is a factor to be considered based on citations to authority outside of the Ninth Circuit. *See, e.g., In re Communications Sys., Inc.,* 2003 WL 21383824, at *4 (N.D.Cal. Feb.24, 2003) (relying on district court opinions from the Seventh and Eleventh Circuits); *In re Emulex Corp. Sec. Litig.,* 210 F.R.D. 717, 721 (C.D.Cal.2002) (relying, as Defendants do here, on the *Berger* case from the Fifth Circuit); *In re THQ, Inc. Sec. Litig.,* 2002 WL 1832145, at *6 (C.D.Cal. March 22, 2002) (citing a district court opinion from the Second Circuit); *In re Pilgrim Sec. Litig.,* 1996 WL 742448, at *6-7 (C.D.Cal. Jan.23, 1996) (citing a district court opinion from the Third Circuit); *Loma Linda Univ. Med. Ctr. Inc. v. Farmers Group, Inc.,* 1995 WL 363441 at *6 (E.D.Cal. May 15, 1995) (relying on an opinion from the Third Circuit); *In re Quarterdeck Office Sys. Litig.,* 1993 WL 623310, at *5-6 (C.D.Cal. Sept.30, 1993) (relying on a district court opinion from the Eighth Circuit); *In re MDC Holdings Sec. Litig.,* 754 F.Supp. 785, 803 (S.D.Cal.1990) (relying on district court opinions from the Third and Eighth Circuits).

### i. Representatives' Individual Interests

To find adequacy of representation, the representatives' individual interests must be the same or similar to the interests of other class members rather than antagonistic to the interests of class members. *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Jordan,* 669 F.2d at 1323. For example, the Supreme Court has held that the conflict in interests between current and future claimants in the *Amchem* asbestos litigation prevented the class representatives from providing adequate representation. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2251, 138 L.Ed.2d 689(1997). Also, Plaintiffs must allege and show that "they personally have been injured." *Lierboe v. State Farm Mut. Auto. Ins. Co.,* 350 F.3d 1018, 1022 (9th Cir.2003). Finally, Plaintiffs' claims must not be subject to unique defenses not relevant to other class members. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). However, "regarding potential conflicts, 'courts have generally declined to consider conflicts, par-

ticularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit.' " *Winkler v. DTE, Inc.,* 205 F.R.D. 235, 242 (D.Ariz.2001) (quoting *Blackie,* 524 F.2d at 909.)

For example, in *Hanlon* the Ninth Circuit explained that "[e]xamination of potential conflicts of interest has long been an important prerequisite to class certification" and cases should be given heightened scrutiny where "class members may have claims of different strength." 150 F.3d at 1020. In finding that the representation was adequate, the Ninth Circuit stated:

> Potential plaintiffs are not divided into conflicting discrete categories, such as those with present health problems and those who may develop symptoms in the future. Rather, each potential plaintiff has the same problem: an allegedly defective rear latchgate which requires repair or commensurate compensation. The differences in severity of personal injury present in *Amchem* are avoided here by excluding personal injury and wrongful death claims. Similarly, there is no structural conflict of interest based on variations in state law, for the named representatives include individuals from each state, and the differences in state remedies are not sufficiently substantial so as to warrant the creation of subclasses. Representatives of other potential subclasses are included among the named representatives, including owners of every minivan model. However, even if the named representatives did not include a broad cross-section of claimants, the prospects for irreparable conflict of interest are minimal in this case because of the relatively small differences in damages and potential remedies.

*Hanlon,* 150 F.3d at 1021.

Plaintiffs argue that there are no actual or potential conflicts of interest between the proposed class members and the representative Plaintiffs because each class member was allegedly harmed by the same conduct in the form of artificially inflated ticket prices. (Pl.'s Mot. at 16–17.) Defendant does not

argue that there are potential or actual conflicts of interests between class members. (Def.s' Opp. at 20–21.)

### ii. Qualifications and Experience of the Representative's Attorney

In evaluating whether class plaintiffs are represented by qualified and competent counsel, courts examine counsels' litigation experience in this type of action. For example, in *Molski*, the Ninth Circuit held that the district court did not abuse its discretion in finding Rule 23(a)(4) satisfied based on its finding that "class counsel had significant experience litigating ADA cases." 318 F.3d at 955. *See also Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125 (S.D.N.Y.2003). Other factors include the proposed counsel's motivation, competence, support personnel, and other professional commitments. *See, e.g., Gomez v. Illinois State Bd. of Education*, 117 F.R.D. 394, 400–02 (N.D.Ill.1987); *Georgia State Conference of Branches of NAACP v. Georgia*, 99 F.R.D. 16, 33–34 (S.D.Ga.1983). Plaintiffs' counsel possess experience in antitrust litigation. *See* (Miller Decl. Ex. 2, 3, 4.)

Another factor in assessing proposed counsel's competence appears to be counsel's prior experience in class action litigation. *See, e.g., Coco v. Incorporated Village of Belle Terre*, 233 F.R.D. 109 (E.D.N.Y.2005) (finding counsel competent to act as counsel for 800 member class where firm had experience in class action litigation at state level involving large classes); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171 (S.D.N.Y. 2005) (counsel adequate where they had previously represented classes); *Jeffreys v. Communications Workers of America, AFL–CIO*, 212 F.R.D. 320 (E.D.Va.2003). Plaintiffs' counsel have significant experience in class action litigation. *See* (Miller Decl. Ex. 2, 3, 4.)

Finally, courts can evaluate the performance of counsel in prior stages of the instant case. *See, e.g., Hatch v. Reliance Ins. Co.*, 758 F.2d 409 (9th Cir.1985); *Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421 (S.D.N.Y.1985); *Zeffiro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D. 567 (E.D.Pa.1983); *Twyman v. Rockville Hous-*ing Authority, 99 F.R.D. 314; *Armstrong v. Chicago Park Dist.*, 117 F.R.D. 623 (N.D.Ill. 1987). The Court finds that Plaintiffs' counsel has performed competently to date. Therefore, the Court concludes that Plaintiffs are represented by qualified and competent counsel, and determines that the requirements of Rule 23(a)(4) are satisfied.

### iii. Knowledge of Class Representatives

As discussed above, the Ninth Circuit has never imposed such a knowledge requirement. However, because some district courts within the Ninth Circuit have imposed such a requirement, the Court will consider this factor.

Defendants argue that the proposed class representatives do not "fairly and adequately protect the interests of the class" due to the representatives' "abdication to counsel." (*Id.* at 20.) Specifically, the Defendants assert that proposed representatives lack knowledge about the basis for the lawsuits, the representatives' knowledge about the suits is solely derivative knowledge acquired from counsel, and the representatives had no input in drafting the complaint and took no steps to confirm that the allegations in the complaint were true. (*Id.* at 21.)

The district courts which have imposed this requirement have recognized that the threshold for sufficient knowledge is not high. All that is necessary is a "rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation." *Thomas & Thomas*, 209 F.R.D. at 165; *see also In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145, at *6 ("[U]nfamiliarity with the suit does not itself require denial of class certification."). The degree of knowledge required is lowered if the case involves complicated legal issues. *See In re Communications Sys., Inc.*, 2003 WL 21383824, at *4; *In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145, at *6; *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. at 721; *In re Pilgrim Sec. Litig.*, 1996 WL 742448, at *6–7; *Kassover v. Coeur D'Alene Mines Corp.*, 1992 WL 509995, at *3 (D.Idaho Sept.2, 1992); *In re MDC Holdings Sec. Litig.*, 754 F.Supp. at 803. As one court explained, imposing a heightened knowledge require-

ment "would render the class action device an impotent tool." *Kassover,* 1992 WL 509995, at *3. This threshold may be reduced even more if there are many class representatives. *See In re Pilgrim Sec. Litig.,* 1996 WL 742448, at *7 ("Although Defendants have asserted that several of the class representatives may not have sufficient knowledge of the case, the large number of class representatives will assure that the attorneys associated with the case will be adequately supervised.").

Consequently, the plaintiff's knowledge must be severely lacking in order to find the representatives inadequate. *In re THQ, Inc. Sec. Litig.,* 2002 WL 1832145, at *6; *see also Yamner v. Boich,* 1994 WL 514035 at *6–7 (N.D.Cal. Sept.15, 1994) (holding that Plaintiff was an adequate class representative because he had "a basic understanding of the allegations," despite the fact that he was unaware of the case's legal history and had probably not read the complaint). In the one district court case within the Ninth Circuit in which the representatives were determined to be inadequate, the court found that the plaintiffs did not seem to care about the case, did not know that several defendants had been dropped, and were unsure as to who was representing them in the case. *In re Quarterdeck Office Sys., Inc. Sec. Litig.,* 1993 WL 623310, at *5–6 (C.D.Cal. Sept.30, 1993). Other examples from outside the Ninth Circuit include a woman who did not know who she was suing or what a "defendant" was, *In re CBC Cos., Inc. Collection Letter Litig.,* 181 F.R.D. 380, 383–84 (N.D.Ill.1998), and a man who had never seen the complaint and could not recall ever seeing any of the representations made in the complaint, *Hillis v. Equifax Consumer Servs., Inc.,* 237 F.R.D. 491, 502 (N.D.Ga.2006).

Having reviewed the deposition transcripts of the class representatives, the Court finds that the representatives demonstrated an understanding of the basic theory for the case. *See, e.g.,* (Rosen Dep. at 18–21, 53–57, 112–114); (MacLaughlan Dep. at 50–59); (Thompson Dep. at 19–20); (Riley Dep. at 4, 14–21); (Young Dep. at 28–33; 113); (Hammer Dep. at 21, 106–111, 159–160). The representatives also evidenced an under-

standing of their duties as class representatives and a willingness to participate in the litigation. *See, e.g.,* (Rosen Dep. at 17–26, 51–53, 142–143); (MacLaughlan Dep. at 50); (Young Dep. at 24, 37–38). Because the representatives demonstrated sufficient knowledge of the litigation and a willingness to assist counsel, the Court holds that the representatives meet the knowledge requirement that some district courts in this Circuit have imposed. *See* 209 F.R.D. at 165. Because the Plaintiffs have made a sufficient showing that representatives do not have conflicts of interest with the proposed class, that Plaintiffs are represented by qualified and competent counsel, and that the representatives have adequate knowledge about the litigation, the Court finds that the requirements of Rule 23(a)(4) are satisfied.

In sum, the Court concludes that Plaintiffs have satisfied all four Rule 23(a) requirements. Therefore, the Court proceeds to analyze whether Plaintiffs have satisfied Rule 23(b).

### D. Rule 23(b) Factors

Plaintiffs must also satisfy Rule 23(b)(1), (b)(2), or (b)(3). Plaintiff seeks to certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3). (Pl.'s Mem. at 17.) Rule 23(b)(3) requires that "the court find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, *and* that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" (emphasis added). Factors to be considered in this determination include:

- "the interest of members of the class in individually controlling the prosecution or defense of separate actions;"

- "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;"

- "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and

- "the difficulties likely to be encountered in the management of a class action."

*Id.*

The predominance inquiry of Rule 23(b)(3) differs from the commonality inquiry of Rule 23(a)(2) in that "[t]he Rule 23(b)(3) analysis 'presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2),' and instead 'focuses on the relationship between the common and individual issues.'" *In re NCAA I–A Walk–On Football Players Litig.*, 2006 WL 1207915, at *9 (W.D.Wash. May 3, 2006) (quoting *Hanlon*, 150 F.3d at 1022). Throughout this analysis, the Court's focus must be "whether the 'evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive' to the trier of fact." *Dukes*, 474 F.3d at 1229 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 135).

### 1. Questions of Law or Fact Common to Members of the Class Predominate Over Any Questions Affecting Only Individual Members

"In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) Possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury," *Pacific Exp., Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.1992) (citing *Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245, 1254 (9th Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991)); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir.1995) (same). *See also*, *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the

willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *Heerwagen*, 435 F.3d at 226–27 (same).[18]

Plaintiffs argue that common issues predominate because common or generalized proof will predominate at trial with respect to the essential elements of the antitrust claims. (Pl.'s Mot. at 17–18.) For example, Plaintiffs contend that each member of the class would introduce exactly the same evidence to demonstrate the scope of the relevant market, possession of monopoly power in the market, and the alleged illegality of Defendants' actions under the Sherman Act. (*Id.* at 18.) Furthermore, Plaintiffs argue that the scope of the relevant product market is a common issue to the members of each regional class, the scope of the relevant geographic market is a common issue to the members of each regional class, and the demonstration of antitrust impact will be proven based on common evidence and methods. (*Id.* at 19–23.) Defendants argue that common issues do not predominate because there is no common product market, no common anticompetitive conduct, and no common injury. (Def.s' Opp. at 11–18.)

### i. Market Definition

The first step in evaluating market power is defining the relevant market. Plaintiffs' expert asserts that the relevant product market is all rock concerts in a given geographic region. Defendants' experts claim that rock concerts are highly differentiated products competing in more than a single product market. (Def.s' Opp. at 15.) Defendants argue that the "class cannot be certified if the putative class members did not purchase in the same product market because it would be impossible to assess whether the defendant's conduct affected them all on a common basis." (*Id.*)

---

**18.** With respect to Plaintiffs' claim for attempted monopolization, the following elements must be proved: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and

(4) causal antitrust injury." *Pacific Exp., Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.1992) (citing *Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245, 1254 (9th Cir.1990), cert, denied, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991)).

"The relevant market is the field in which meaningful competition is said to exist." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202–1203 (9th Cir. 1997). "Generally, the relevant market is defined in terms of product and geography." *Id.* Defendants do not contest that the relevant geographic market is a common issue to the members of each regional class.

"For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir.2003) (quoting *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 250, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959)); *see also Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.1988) ("The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."); Areeda & Hovenkamp, *Antitrust Law* ¶ 560 ("A product grouping constitutes a market if a hypothetical defendant controlling its output could maximize profits by charging significantly more than the competitive price for a significant period."); *Id.* ¶ 530a ("[A] market is the arena within which significant substitution in consumption or production occurs.").

Calculating the cross-elasticity of demand is often the first step in defining a market. *See, e.g., Lucas Automotive Engineering, Inc. v. Bridgestone*, 275 F.3d 762, 767 (9th Cir.2001); *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir.1981); United States Department of Justice and the Federal Trace Commission, Horizontal Merger Guidelines § 1.11 (1997) [*hereinafter* "Merger Guidelines"].[19] Cross-elasticity of demand measures the substitutability of two products by determining whether consumers will shift from one product to another in response to

changes in the relative costs of the two products. *Bridgestone*, 275 F.3d at 767; *SuperTurf*, 660 F.2d at 1278. Cross-elasticity of demand is calculated based on changes in the quantity demanded in response to changes in price:

> The responsiveness of demand to changes in the price of another product is called the cross elasticity of demand. It is denoted ηxy and defined as follows:
>
> ηxy = (% change in quantity demanded of X) / (% change in price of Y)
>
> The change in the price of good Y causes the demand curve for good X to shift. If X and Y are substitutes, then an increase in the price of Y leads to an increase in the demand for X. If X and Y are complements, then an increase in the price of Y leads to a reduction in demand for X. In either case, we hold the price of X constant. We therefore measure the change in the quantity demanded of X (at its unchanged price) by measuring the shift of the demand curve for X.

Lipsey, Richard G. et al., *Microeconomics*, 99 (12th ed.1998); *see also* Mansfield, Edwin, *Microeconomics: Theory/Applications*, 128 (6th ed. 1988) ("The cross elasticity of demand is defined as ηxy = ($\triangle$Qx/Qx) / ( Py/Py) where $\triangle$Py is the change in the price of good Y, Py is the original price of good Y, Qx is the resulting change in the quantity demanded of good X, and Qx is the original quantity demanded of good X.") "A high cross elasticity of demand indicates that products are close substitutes, and should probably be treated as part of the same market. A low or zero cross elasticity of demand is evidence that products do not compete in the same relevant market." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1483 (9th Cir.1997) (Wallace, C.J., concurring-in-part and dissenting-in-part).

**19.** The Merger Guidelines provide the following test to determine which products should be included in the market:

> [T]he Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a "small but significant and nontransitory" increase in price, but the terms

of sale of all other products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product.

Merger Guidelines § 1.11.

Areeda and Hovenkamp explain that substitutability can also be determined by analyzing cross-elasticity of supply:

> Two products, A and B, are in the same relevant market if substitutability at the competitive price is very high as measured from *either* the demand side or the supply side. To have separate markets, one must find that a significant price increase beyond the competitive level in the A price would *neither* induce customers of A to buy B instead, nor induce B producers to make A. Thus, although not close substitutes for each other on the demand side, two products produced interchangeably from the same production facilities are in the same market.

Areeda & Hovenkamp, *Antitrust Law* ¶ 561 (emphasis in original). Numerous courts consider cross-elasticity of supply in defining the relevant market, not simply cross-elasticity of demand. *See, e.g., Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir.1995); *AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir.1999); *Calnetics Corp. v. Volkswagen of Am.*, 532 F.2d 674, 691 (9th Cir.1976); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 691 (9th Cir.1976); *Rothery Storage Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir. 1986); *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1410–11 (7th Cir. 1995); *United States Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 995 (11th Cir.1993); *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F.Supp. 1231, 1257 (S.D.Fla.1984); *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F.Supp.2d 1048, 1081 (D.Colo. 2004); Bauer, Joseph P. & Page, William H., *Kinter Federal Antitrust Law*, § 10.4 (2002 ed.).

However, while cross-elasticities of demand and supply provide the most reliable measures of market definition, "it is ordinarily quite difficult to measure cross-elasticities of supply and demand accurately." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir.1993). Therefore,

courts consider a wide range of evidentiary sources in evaluating substitutability and estimating cross-elasticity of demand. In *Brown Shoe Co. v. United States*, the Supreme Court held that courts could determine the boundaries of an antitrust market "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Although *Brown Shoe* involved the definition of submarkets, the Ninth Circuit has held that the *Brown Shoe* factors "are relevant even in determining the primary market to be analyzed for antitrust purposes." *Olin Corp. v. F.T.C.*, 986 F.2d 1295,1299 (9th Cir. 1993) (citing *United States v. Continental Can Co.*, 378 U.S. 441, 449–55, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964)). *See also H.J., Inc. v. Internat'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1540 (8th Cir.1989) (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 518.1 at 311–15 (1987 Supp.)); *Nobody in Particular Presents*, 311 F.Supp.2d at 1082–83 (compilation of cases which have held that a plaintiff may define a relevant market without a cross-elasticity of demand analysis so long as sufficient evidence of other indicia of market definition is introduced).

### a. Plaintiffs' Expert

Plaintiffs rely on the expert report of Professor Owen Phillips in support of their claim that the relevant product market is "live rock concerts" in a given geographic region.[20] Phillips contends that the relevant product market in this case is "live rock music concerts." (*Id.* ¶ 29.) Although Phillips does not attempt to calculate the cross-elasticities of demand or supply for particular rock concerts, Phillips claims that rock concerts constitute a single product market for several reasons. First, Phillips asserts that rock music is an identifiable genre. (*Id.*) Phillips notes that Webster's Ninth New Collegiate Dictionary defines rock music as "popular

---

20. Phillips is a professor of economics at the University of Wyoming who received his Ph.D. in economics at Standford University in 1980 and previously worked at the Antitrust Division of the United States Department of Justice. (Phillips Prelim, Report. ¶ 1.)

music played on electronically amplified instruments and characterized by a persistent heavily accented beat, [with] much repetition of simple phrases." (*Id.*) Phillips highlights that rock music is identified as a distinct genre by industry radio guides such as *Arbitron* and *Duncans*, and by industry sources such as *Billboard* and *Radio & Records*. (*Id.* ¶¶ 31, 33.) Phillips also states that "bands, artists, record labels, and fans have no difficulty distinguishing between rock music and other types of music, such as jazz, classical, and country and western." (*Id.* ¶ 34.)

Second, Phillips argues that "[s]ubstitutability (or interchangeability) across rock artists is common sense." (*Id.* at 9.) In support of this argument, Phillips emphasizes that the musical tastes of the class representatives demonstrates that substitutability exists between rock concerts. (Phillips Rebuttal report at 9–10.) For example, Phillips points out that Plaintiff Riley has attended concerts by U2, Bob Dylan, Madonna, and Pearl Jam. (Riley Depo. at 8, 9, 22.). *See also* (Hayes Depo. at 30–57) (attended concerts by Bruce Springsteen, Roger Waters, Crosby Stills Nash & Young, Indigo Girls, Prince, Eric Clapton, Elton John, Billy Joel, Bob Sieger, Melissa Ethrdige, and the Who); (Young Depo. at 18–27) (attended concerts by Bruce Springsteen, Elvis Costello, and the Rolling Stones).

Third, Phillips concedes that cross-elasticities of demand vary across concerts for individual buyers. However, Phillips contends that this fact does not prevent rock concerts from being defined as a market because the Court must examine the market collectively:

> In any market the collection of buyers or the class is made up of individuals with different tastes. The definition of the market still rests on the fundamental concept that it is a good collection of goods that consumers find to be good substitutes. It is a collection of goods, which if sold by one vendor, would generate higher revenues with a small price increase. As with any market there will be individuals who

have strong opinions about quality. Just as some automobile buyers have strong preferences between a Ford and Chevy, buyers in the relevant rock concert will have strong opinions about the difference in quality between U2 and Metallica. These individual tastes do not destroy the definition of a market, nor do they destroy the definition of a class of buyers harmed by high ticket prices.

(*Id.* ¶ 38.)

Finally, Phillips notes that he was the plaintiff's expert in *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F.Supp.2d 1048 (D.Colo.2004). In that case a rock concert promoter in Denver named Nobody in Particular Presents, Inc. ("NIPP") sued Clear Channel in 2001. Similar to the allegations in the MDL, the concert promoter alleged that Clear Channel violated the Sherman Act "by conditioning air-play of an artist's songs and promotional support for the artist's concerts on the artist's use of SFX/Clear Channel Entertainment or Clear Channel Concerts/Clear Channel Radio Festivals for the artist's concert-promotions needs in the Denver market." *Id.* at 1091. With respect to both the monopolization and attempted monopolization claims, NIPP argued that the relevant product market "is the market for tickets to rock music concerts, where the seller is the music concert promoter and the buyer is the concert-going public."[21] *Id.* at 1077.

Defendant Clear Channel filed a motion for summary judgment on all claims. The first step in the Colorado district court's analysis of the Sherman Act claims was to "examine the reasonable interchangeability of the rock concerts and non-rock concerts to the concert-going public in order to determine whether NIPP sets forth sufficient evidence to define the scope of the relevant market for the monopolization and attempted monopolization claims." *Id.* at 1078. The court noted that "[t]here is only one relevant market definition for NIPP's monopolization and attempted monopolization claims, despite

---

21. Defendant Clear Channel argued that the relevant markets should be defined as "all music, not just rock." 311 F.Supp.2d at 1080. In contrast,

Defendant Clear Channel now argues that the relevant market proposed by Plaintiffs in this case—all rock concerts—is too broad.

the fact that numerous inputs are implicated." *Id.* n. 5.

The court's market definition analysis involved consideration of cross-elasticity of demand, cross-elasticity of supply, and examination of practical indicia. *Id.* at 1080–85. While the court observed that NIPP's expert witness, Dr. Phillips, failed to perform an economic analysis of cross-elasticity of demand, the court found that Phillips had analyzed other practical indicia of the relevant market. *Id.* at 1083. Phillips' analysis of other indicia included: (1) assimilation of "data supporting the assertion that the industry and the public view rock concerts as a separate and distinct market from non-rock concerts," (2) the presentation of "evidence that rock concerts have uses and qualities distinctive from non-rock concerts," and (3) the presentation of "evidence of distinct price and of pricing patterns for rock concerts." *Id.* at 1083–84. The district court concluded that "NIPP has set forth evidence of the practical indicia necessary to define the relevant market as tickets for rock concerts." [22] *Id.* at 1084.

### b. Defendants' Experts

Defendants argue that Phillips' market definition analysis is flawed in several respects. Defendants submitted an expert report prepared by Professor Richard J. Gilbert.[23] Gilbert asserts that the 9 "relevant product markets appropriate to the analysis of the allegations in these cases are significantly narrower than the 'all rock concerts' product market alleged by plaintiffs and their expert." (Gilbert Report ¶ 10.) Gilberts posits that "there are many relevant product markets, each one much narrower than the market defined by plaintiffs." (Gilbert Report ¶ 33.)

Gilbert explains that "[a] relevant product market contains products that consumers consider to be close substitutes for each other." (Gilbert Report ¶ 20.) Thus, Gilbert's

analysis is based solely on consumers alleged views of the substitutability of rock concerts. For example, Gilbert argues that "[b]ecause the potential purchasers of rock concert tickets do not consider all or most rock concerts to be close substitutes, it is inappropriate to group them within a single relevant product market." (Gilbert Report ¶ 21.) Similarly, Gilbert states that "when individual tastes differ enough for two products, then they are not in the same relevant product market." (Gilbert Report ¶ 22.)

#### 1. Cross-elasticity conclusions based on testimony of class representatives

Gilbert relies on statements made by the respective class representatives during their depositions in support of his contention that individuals do not consider rock concerts to be substitutes. For example, Adam Rosen, the representative for the proposed Boston Region, stated that he "wouldn't just go to a concert for the sake of going because it was less expensive than another." (Rosen Depo. at 68:25–69:15.) Gilbert concludes that Rosen's comment "is equivalent to Mr. Rosen saying that for him there is no cross-price elasticity between concerts by different artists and thus he does not consider a concert by any one artist to be a close substitute for a concert by other artists." (Gilbert Report ¶ 23.) Similarly, Gilbert points out that Manish Bhatia, the named representative for the proposed Chicago Region class, does not consider Creed or Rush to be acceptable substitutes for Pearl Jam. (Bhatia Depo. at 71:3–74:2.) Gilbert explains that the fact that "Bhatia would not see Rush even at a much cheaper price than Pearl Jam is equivalent to there being no cross-price elasticity between the concerts of Pearl Jam and Rush from his perspective." (Gilbert Report ¶ 24.) *See also* (Gilbert Report ¶¶ 25–26) (interpreting statement by other class representatives as indicating that there is no cross-price elasticity between various rock concerts.) Defen-

---

**22.** The Court proceeded to grant-in-part and deny-in-part Clear Channel's motion for summary judgment. *Id.* at 1121. The case settled prior to trial. (Def.'s Opp. at 6.)

**23.** Gilbert is currently a Professor of Economics at the University of California at Berkley. (Gil-

bert Report ¶ 1.) Among other positions, Gilbert was the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice from 1993 to 1995 and the Chair of the Department of Economics at Berkley from 2002 to 2005. (*Id.* ¶¶ 1, 4.)

dants also submit declaration from various Live Nation executives and artists managers in support of Defendants' argument that cross-elasticity of demand between bands is low. *See* (Campana Decl. ¶ 2) ("If a fan does not like a particular artist or band, she will not switch her preference to that artist merely because of that artist's concert ticket price."); (Guernot Decl. ¶ 7) ("the fans of each one of my clients would very likely list only a small number of artists whom they would consider seeing in concert instead of my client."); (Innamorato Decl. ¶ 13) ("In my experience, a higher or lower ticket price for one artist will not influence a person to change his or her mind and go see another artist on the same night."); (Lavoisne Decl. ¶ 6) ("[I]f Barenaked Ladies tickets are $20 cheaper than Coldplay tickets, that will not cause Barenaked Ladies fans to go see Coldplay instead.")

Gilbert's conclusion that rock concerts are not close substitutes based on his analysis of statements by class representatives is questionable for several reasons. First, as stated by Professors Areeda and Hovenkamp, the "least reliable" evidence in predicting the effects of a hypothetical price increase is " 'subjective' testimony by customers that they would or would not defect in response to a given price increase." Areeda & Hovenkamp, *Antitrust Law* ¶ 538b. *See also F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir.1999). "Though not irrelevant, such statements are often unreliable, especially when the question is oversimplified." Areeda, *supra*, ¶ 538b.

Setting aside the unpersuasive nature of the evidence on which Gilbert bases his opinion, Gilbert's analysis is more fundamentally flawed because he bases his conclusions about cross-elasticity of demand on the consumption decisions of individual purchasers. For example, Gilbert concludes that representative Rosen's comment that he "wouldn't just go to a concert for the sake of going because it was less expensive than another . . . is equivalent to Mr. Rosen saying that for him there is no cross-price elasticity between concerts by different artists and thus he does not consider a concert by any one artist to be a close substitute for a concert by other artists." (Gilbert Report ¶ 23.) However, when calculating the cross-elasticity of demand, economists examine the aggregate demand of consumers as represented by a demand curve rather than the purchasing decisions of an individual consumer. *See, e.g.,* Mansfield, Edwin, *Microeconomics: Theory/Applications*, 128 (6th ed. 1988) ("Holding constant the commodity's own price (as well as the level of money incomes) and allowing the price of another commodity to vary, there may be important effects on *the quantity demanded in the market* for the commodity in question.") (emphasis added). *See also* Lipsey, Richard G. et al., *Microeconomics*, 88–100 (12th ed.1998). Thus, whether or not various rock concerts are close substitutes for representative Rosen does not demonstrate whether the aggregate quantity demanded in the market for one concert will be affected by a price increase for another concert.[24]

### 2. Cross-elasticity conclusions based on a comparison of prices

Gilbert also concludes that the cross-price elasticity between concerts is "zero or very low" based on analysis of the average price of a concert ticket for twenty-one various artists in 2001. (Gilbert Report ¶¶ 29–30, Figure 1.) Gilbert observes that the average

---

24. Phillips also explains that the fact that products have low price-elasticities does not necessarily mean that two products have a low cross-elasticity of demand. Phillips provides the following example to illustrate this distinction. (Phillips Rebuttal Report at 6–7.) First, Phillips assumes that there are two types of rock bands, type A and type B. (*Id.* at 6.) Second, Phillips assumes that type A bands sell 1000 tickets per year in a geographic region and type B bands sell 500 tickets per year in the same geographic region. (*Id.* at 6–7.) Next, Phillips assumes that A's ticket prices are raised by 5% and this causes 40 ticket buyers from type A's bands to decide to attend a type B concert instead. (*Id.* at 7.) Phillips notes that this results in a cross-price elasticity of 1.6. (*Id.*) Phillips explains that this is a "reasonably high" cross-price elasticity which indicates that the two band types should be in the same market. (*Id.*) Phillips emphasizes that the cross-price elasticity is reasonably high even though the price elasticity of group A is sufficiently low that group A can raise its price without a significant loss in sales. (*Id.*)

prices range from $12.67 for the group "Seven Nations" to $189.04 for Cream. (Gilbert Report ¶ 29.) Gilbert concludes that "[t]he broad range of average prices shown in Figure 1 reflects the great variation across artists in the 'willingness to pay' of consumers for tickets to those artists' concerts ... [and] suggests that cross-price elasticity between concerts with very different prices is often zero or very low." (Gilbert Report ¶ 30.) Gilbert supports this conclusion with the following reasoning:

> For example, if there were any cross-price elasticity between the concerts of Cream (average 2005 price = $189.04) and the concerts of Modest Mouse (average 2005 price = $23.49), so many concert goers would have decided to see Modest Mouse at its much lower price instead that the concert halls for Cream would have been nearly empty. Instead, Cream sold over 56,000 tickets to its three sold-out shows at the Madison Square garden Arena.

(Gilbert Report ¶ 31.)

Gilbert's conclusion that the substantial difference in prices demonstrates that cross-elasticity of demand is low is economically flawed. As discussed above, cross-price elasticity of demand is "[t]he responsiveness of demand [for one product] to changes in the price of another product." Cross-elasticity of demand is calculated as follows: $\eta_{xy}$ = (% change in quantity demanded of X) / (% change in price of Y). Thus, the difference in price between the two products is irrelevant—the only relevant price is the *change* in price of product Y. Consequently, the fact that Cream sold over 56,000 tickets at three concerts even though its ticket price was $189.04 and the price of Modest Mouse tickets was $23.49 reveals nothing about the cross-elasticity of demand between the two concerts.[25]

Similarly flawed arguments have been condemned by the Ninth Circuit. For example, in *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, the Ninth Circuit stated that "the scope of the relevant market is not governed by the presence of a price differential between competing products." 512 F.2d 1264, 1274 (9th Cir.1975). The Ninth Circuit noted that in *United States v. E.I. du Pont de Nemours & Co.*, the Supreme Court included cellophane in the flexible wrapping market even though the cost of cellophane was two to three times more than the other products in the market. *Id.* (citing 351 U.S. 377, 401, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)).

### 3. Failure to consider cross-elasticity of supply

Gilbert admits that "[f]rom the perspective of a promoter, concerts by two very different rock artists such as John Mayer and Nine Inch Nails might indeed be close substitutes, because both might be able to satisfy the promoter's need to have a concert which the promoter can sell tickets, fill a venue, and make a profit." (Gilbert Report ¶ 19 n. 11.) Thus, Gilbert concedes that the cross-elasticity of supply may be quite high. However, Gilbert contends that the Court need not analyze the market from the perspective of a promoter because the MDL cases were brought by consumers rather than promoters. (Gilbert Report ¶ 19 n. 11.)

The Ninth Circuit has stated that "defining a market on the basis of demand considerations alone is erroneous" because "[a] reasonable market definition must also be based on 'supply elasticity.'" *Rebel Oil*, 51 F.3d at 1436 (citing *Virtual Maintenance, Inc. v. Prime Computer Inc.*, 11 F.3d 660, 664 (6th Cir.1993) and Areeda & Hovenkamp, *Antitrust Law* ¶ 533f.). Defendants have failed to point the Court to any case or treatise stating that the nature of the plaintiff dic-

---

**25.** To calculate the cross-elasticity of demand, it would be necessary to estimate the percentage change in the quantity demanded of Modest Mouse tickets in response to a percentage change in the price of Cream tickets. Alternatively, cross-elasticity of demand could be calculated by estimating the percentage change in the quantity demanded of Cream tickets in response to a percentage change in the price of Modest Mouse tickets. "However, it should not be expected that the two elasticities will have the same numerical value ... [because even if two goods are substitutes] the consumption of good X may be more sensitive to changes in the price of good Y than the consumption of good Y is to changes in the price of good X." Mansfield, Edwin, *Microeconomics: Theory/Applications*, 130–31 (6th ed.1988).

tates how the court should analyze market definition.

### 4. Differentiation does not preclude market definition

Gilbert argues that rock concerts for each artist might constitute a separate market because each rock concert is a differentiated product. However, Defendants' contention that rock concerts are differentiated products does not necessarily compel the conclusion that rock concerts, when aggregated, cannot be defined as a single market. Areeda and Hovenkamp define product differentiation:

> Product differentiation ordinarily describes narrower differences that at least some buyers value. Identical grocers a few blocks apart may differ in the minds of buyers closer to one of the other. Consumers may favor one brand over another of physically identical or similar aspirin. Many machines performing the same function—such as copiers, computers or automobiles—differ not only in brand name but also in performance, physical appearance, size, capacity, cost, price, reliability, ease of use, service, customer support, and other features. Nevertheless, they generally compete with one another sufficiently that the price of one brand is greatly constrained by the price of others. In one sense, any item is differentiated when any buyer distinguishes among the offerings of different sellers. But this extreme definition has little utility. The differences may be trivial: that all buyers would pay a penny more for a particular computer hardly matters to anyone. Differences may be substantial and yet "wash out" when buyer preferences for a certain feature of any item are offset by disutilities of other features of that item. Even net preferences by some buyers of one seller's version of a product may be balanced by opposite preferences by other buyers. In that event, sellers regard themselves as competing on more or less equal terms for market shares.... For antitrust purposes, we apply the differentiated label to products that are distinguishable in the minds of buyers but not so different as to belong in separate markets.

Areeda & Hovenkamp, *Antitrust Law* ¶ 563a. Areeda and Hovenkamp conclude that "[t]he answer is almost uniformly negative" whether "the degree of power inherent in each differentiated product [is] sufficient to make each brand a separate market." Areeda & Hovenkamp, *Antitrust Law* ¶ 533e.

For example, courts have defined the presumptive market to include various rival products which could be differentiated by brand. *See, e.g., Theatre Party Assoc., Inc. v. Shubert Org., Inc.*, 695 F.Supp. 150, 154–55 (S.D.N.Y.1988) (rejecting argument that the Broadway show Phantom of the Opera constituted its own product market because "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events" would provide "adequate substitute' products"); *Belfiore v. The New York Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (rejecting claim that the New York Times newspaper constituted its own market because substitutes included all "general circulation daily newspapers"); *Package Shop, Inc. v. Anheuser–Busch, Inc.*, 675 F.Supp. 894, 943–45 (D.N.J.1987) (finding rival beers to presumptively be in same product market); *Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co.*, 912 F.Supp. 747, 766–67 (D.N.J.1995) (finding all medium and heavy duty trucks to constitute a single market); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487–88 (5th Cir. 1984) (finding hotel rooms in general, rather than Holiday Inn hotel rooms, to constitute the relevant market); *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co., Inc.*, 614 F.2d 832 (2d cir.1980) (defining product market to include private label and brand name frozen waffles); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273 (4th Cir.1977) (defining market to include premium and lower quality canned dog food); *United States v. Jos. Schlitz Brewing Co.*, 253 F.Supp. 129 (N.D.Cal.1966), *aff'd per curiam* 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35 (finding private label and premium beer to share the same market); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 679 (S.D.N.Y.1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces."); *Deep South Pepsi–Cola Bottling*

*Co., Inc. v. Pepsico, Inc.*, 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989) ("There can be no serious dispute that Pepsi–Cola products are in competition with many other soft drinks."); *Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 705 (S.D.N.Y.1997) (explaining that the argument that a differentiated product constitutes a single market "is analogous to a contention that a consumer is 'locked into' Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.' A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network."). Therefore, the claim that each rock concert is a differentiated product does not necessarily compel the conclusion that each concert constitutes a single product market.

### 5. *Evidence of Similar Price Trajectories*

Finally, one of Defendants' own exhibits supports the inference that rock concerts belong in a single market. Figure 3 of Gilbert's expert report is a graph depicting the average concert ticket price for selected artists between 1981 and 2006. (Gilbert Report Figure 3.) The graph contains data for a wide range of disparate artists from various genres such as Madonna, the Rolling Stones, and Garth Brooks. (*Id.*) The graph illustrates how the average ticket prices for these various artists have followed roughly the same upward trajectory over the past twenty years. (*Id.*) "When the prices of two products (or. of the same product in two regions) change in the same direction and by similar amounts over a substantial period of time, they are presumptively in the same market."[26] Areeda & Hovenkamp, *Antitrust Law* ¶ 534c.

### c. *Market Definition Involves Similar Questions of Law and Fact*

Defendants argue that the Court should find that individual issues predominate be-cause rock concerts do not constitute a single market. However, as the Court's analysis demonstrates, there is considerable disagreement between the experts about whether rock concerts constitute a single market. For example, based on essentially the same set of data, the experts form different conclusions about the cross-price elasticities of demand. The experts also draw different inferences about the substitutability of rock concerts based on the testimony of class plaintiffs. Finally, the analyses of both experts may be flawed in various respects, such as failing to consider cross-elasticity of supply, and calculating cross-elasticity of demand merely by comparing the prices for two different products.

Despite vigorous argument from both parties, the Court cannot resolve this dispute over market definition in a motion for class certification. Defining the "[r]elevant market is a factual issue which is decided by the jury." *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (citing *Los Angeles Memorial Coliseum Comm'n v. N.F.L.*, 726 F.2d 1381, 1392 (9th Cir.1984)); *see also Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir.1991) ("Ordinarily, the relevant market is a question of fact for the jury"); *Agron, Inc. v. Lin*, 2004 WL 555377, at *8 (C.D.Cal.2004) (same); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 133 F.R.D. 41, 44 (D.Nev.1990) ("The Ninth Circuit has established that both market definition and market power are essentially questions of fact appropriate for jury consideration"); *Nobody in Particular Presents*, 311 F.Supp.2d at 1083 ("The scope of the market is usually a question of fact for the jury.") (citing *Telecor Comm., Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002)). As discussed in Part V.B, a district court could resolve this issue to the extent necessary to evaluate the Rule 23 requirements in some circuits. However, this court is precluded from resolving such issues pursuant to *Dukes*.

Moreover, as discussed at length in Part V.B, the Court must "avoid resolving 'the

---

**26.** However, such evidence is far from conclusive because the price increases might simply be due to changes in common costs. Areeda & Hovenkamp, *Antitrust Law* ¶ 534c.

battle of the experts' at this stage of the proceedings." *Dukes,* 474 F.3d at 1229. Thus, the Court cannot weigh the various expert testimonies and define the relevant product market as a matter of law. Based upon this limited inquiry permitted by *Dukes,* the Court cannot determine that each rock concert constitutes an individual market at this stage in the proceedings. Therefore, the Court cannot conclude that individual issues will predominate due to the lack of a single product market.

Instead, for purposes of resolving the motion for class certification, the nature of the Court's inquiry centers on determining the extent to which a definition of the relevant product market will involve common questions of law and fact. As the above analysis illustrates/ the process of defining the product market will be predominated by common questions. The analysis involves the same data, the same experts, the same industry analyses, and the same application of the same economic tests. It would be incredibly inefficient to duplicate this analysis in thousands of individual cases.

Defendants' argument that individual questions will predominate is misleading because Defendants' argument presumes that the Court will define each concert as an individual market. However, the Court is not concerned with the *outcome* of the analysis—how the market is defined is to be determined by the jury.[27] Instead, the Court's focus is the process of defining the relevant market, and this process will clearly be predominated by common questions of law and fact. Therefore, the Court finds that common issues of law and fact predominate with respect to market definition.[28]

### ii. Possession of Monopoly Power in the Relevant Market

For the same reasons that the market definition analysis is predominated by common questions of law and fact, the Court holds that the possession of monopoly power analysis is predominated by common questions of law and fact.[29]

### iii. The Alleged Anti-competitive Conduct

At the outset, it is necessary to emphasize that whether Defendants engaged in the alleged anti-competitive conduct is a distinct issue from whether such conduct caused Plaintiffs' alleged injuries. The Plaintiffs allege that the Defendants engaged in a wide range of anti-competitive conduct to acquire and maintain Clear Channel's monopoly in the rock concert promotion market, including merging with primary competitors, leveraging Clear Channel's market power in the radio market, and bidding up artist fees beyond competitive levels. Defendants argue that there is no common anti-competitive conduct. (Def.'s Opp. at 18–19.) For example, Defendants claim that the Court would

27. Alternatively, the Court could define the market in a motion for summary judgment if there are no material disputes of facts and one party is entitled to a particular definition as a matter of law.

28. The Court also holds that individual issues would not predominate even if delineating the boundaries of a "rock" market involved deciding whether various fringe artists should be properly categorized as rock. In *Nobody in Particular Presents* case, Clear Channel similarly argued that a jury would have difficulty distinguishing between rock and non-rock concerts, especially with regard to certain fringe artists such as Jewel and Sheryl Crow. *311 F.Supp.2d at 1090.* The district court rejected this argument:

> Just as "customers know a department store when they see it," 21 customers know a rock concert when they hear it, as will the jury. [*Bon–Ton Stores, Inc. v. May Dept. Stores Co.,* 881 F.Supp. 860, 870 (W.D.N.Y.1994)] That

the outer edge of a market's boundaries are a disputed does not mean the market is legally flawed for purposes of a motion for summary judgment. Market boundaries of necessity may be imprecise. Antitrust Law Developments (Fifth) at 525. Therefore, the question of boundaries is most properly answered by the jury.

311 F.Supp.2d at 1090.

The Court finds this reasoning persuasive. Moreover, to the extent an individual analysis would be required to determine whether fringe artists fell within the market definition, common questions of law and fact establishing the definition in general would predominate over questions concerning such fringe artists.

29. Defendants do not argue that this factor would involve substantial individual questions of law or fact.

need to examine the alleged radio monopoly leveraging claims on an artist-by-artist basis.

However, the Court finds that proving the alleged anti-competitive conduct will predominantly involve common evidence. Plaintiffs allege that Clear Channel engaged in a calculated course of conduct to leverage its market power in the radio market into the concert promotion market. While the implication of this strategy necessarily involves numerous discrete acts, common evidence can be used to show that Clear Channel engaged in this overall course of conduct. For example, Defendants submitted numerous declarations from Clear Channel radio station program directors. All of the program directors state that the selection of which songs receive radio airplay is determined by consumer preferences generated by internal research as to what the station's listeners like to hear. See (Buchman Decl. ¶ 3) (program director for Clear Channel radio station in New York); (Ivey Decl. ¶ 7) (operations manager who oversees all program directors for Clear Channel's Los Angeles radio stations); (Markesich Decl. ¶ 6) (program director for two Clear Channel radio stations in Boston); (Davis Decl. ¶ 7) (vice president of programming who oversees all of the program directors for Clear Channel's Chicago radio stations). Similarly, the program directors state that their stations only accept concert promotions proposals for concerts that will appeal to the station's listeners. See (Buchman Decl. ¶ 5); (Ivey Decl. ¶ 5); (Markesich Decl. ¶ 4); (Davis Decl. ¶ 6.) Similarly, Plaintiffs submit various documents purporting to show that Clear Channel's radio stations withheld airplay for artists whose concerts were not being promoted by Clear Channel. See (Pl.'s Hearing Exs. A, B, D, F–H.) While the Court cannot consider these submissions for the purposes of resolving the merits of Plaintiffs' claims, the submissions show that common evidence, such as the testimony of program directors, would be used to prove or disprove whether the alleged anticompetitive conduct occurred.

Defendants' contention that the Court would need to examine the alleged radio monopoly leveraging claims on an artist-by-artist basis is incorrect. In order to satisfy this element, all the Plaintiffs must show is that Clear Channel engaged in some form of prohibited conduct. Whether the conduct caused a specific artists' ticket prices to increase is a distinct inquiry analyzed under the rubric of casual antitrust injury. Therefore, the Court finds that common issues predominate with respect to this element of the monopolization claim.

### iv. Casual Antitrust Injury

Private parties are permitted to bring suits to enforce the Sherman Act pursuant to Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15, 26. Section 4 of the Clayton Act provides in pertinent part:

> Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

"By providing that only those persons 'who shall be injured in [their] business or property by reason of anything forbidden in the antitrust laws' may sue ... the antitrust plaintiff must establish that it suffered injury, also known as impact or fact of damage, and that the injury was materially and directly caused by an antitrust violation." 8 von Kalinowski et al., supra, § 160.02[2][c]. "There are two distinct aspects to what in antitrust literature has come to be known as a requirement of fact of damage." Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir.1977); see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (same); MetroNet Services Corp. v. U.S. West Communications, 329 F.3d 986, 1008 (9th Cir.2003), vacated on other grounds by Qwest Corp. v. MetroNet Services Corp., 540 U.S. 1147, 124 S.Ct. 1144, 157 L.Ed.2d 1040 (2004) (same). The first aspect "is founded upon the recog-

nition that some limitation must be placed upon liability stemming from violations which may have a widespread and unforeseeable ripple effect throughout the economy ... [and therefore] courts have uniformly limited the private action to those plaintiffs whose injury is not too indirect, remote or incidental a consequence of a violation." *Bogosian,* 561 F.2d at 454; *see also Brunswick,* 429 U.S. at 489, 97 S.Ct. 690 (holding that to prove antitrust injury, plaintiffs must first prove "injury of the type the antitrust laws were intended to prevent.") This aspect of the injury analysis is analyzed under the rubric of standing. *Bogosian,* 561 F.2d at 454. Defendants have not challenged the standing aspect of injury with respect to the monopolization claim.[30]

The second aspect of impact or fact of damage "is purely factual and does not involve questions of policy in its routine application." [31] *Bogosian,* 561 F.2d at 454; *see also Brunswick,* 429 U.S. at 489, 97 S.Ct. 690 (holding that to prove antitrust injury, plaintiffs must also prove that the injury "flows from that which makes defendants' acts unlawful.") Fact of damage involves two intertwined questions: (1) whether "the plaintiff suffered some loss in his business or property," and (2) whether "there is a casual relationship between the violation and the loss." *Bogosian,* 561 F.2d at 454; *see also MetroNet,* 329 F.3d at 1008 (same). To demonstrate causation, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith,* 395 U.S. at 114 n. 9, 89 S.Ct. 1562.

Finally, the amount of damages sustained by Plaintiffs is a separate and distinct issue from fact of damage or impact. *See Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1350 (9th Cir.1986) ("[T]he requirement that plaintiff prove 'both the fact of damage and the amount of damage ... are two separate proofs.' ") (quoting *Knutson v. Daily Review, Inc.,* 468 F.Supp. 226, 229 (N.D.Cal.1979),

*aff'd,* 664 F.2d 1120 (9th Cir.1981)); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ("[The plaintiff's] burden of proving the fact of damage under [Section] 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.") (emphasis in original); *MetroNet,* 329 F.3d at 1008–09 (same); *Lumco Indus., Inc. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 172 (E.D.Pa.1997) ("First, Plaintiffs must prove that Defendants violated the antitrust laws. Second, Plaintiffs must prove the fact of damage, or the impact, of Defendants' unlawful activity. Third, Plaintiffs must prove the amount of damages sustained by said activity."); 8 von Kalinowski et al., *supra,* § 171.03[1]. Fact of damage and amount of damages are subject to different burdens of proof. *See Flintkote Co. v. Lysfjord,* 246 F.2d 368, 392 (9th Cir.1957); 8 von Kalinowski et al., *supra,* § 171.03[1].

Defendants argue that proving both impact and the amount of damages involves substantial individual factual questions based on the factual allegations in this case. With respect to impact, Defendants contend that some class members suffered no harm, and furthermore that there is no casual relationship between the alleged harm and Defendant's alleged anti-competitive conduct. Even if impact were established, Defendants assert that Plaintiffs have failed to provide a workable method of calculating damages.

### a. Individual Issues Concerning Fact of Damages/Impact Would Preclude Class Certification

The parties disagree over whether the existence of individualized issues concerning fact of damages would preclude class certification. Beginning with the Ninth Circuit's decision in *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975), courts in the Ninth Circuit have consistently held that the existence of individualized issues of damages does not

---

**30.** Defendants challenge Plaintiffs' standing for the attempted monopolization claim. *See* (Def.'s Mot. to Dismiss.) Defendants' motion is addressed in Part VI.

**31.** Hereinafter, the Court refers to this second aspect when it uses the term "impact" or "fact of damage."

automatically preclude class certification. *See Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment."). *See also Harmsen v. Smith*, 693 F.2d 932, 946 (9th Cir.1982) (same); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 244 (D.Ariz.2001) (same); *Wilkinson v. F.B.I.*, 99 F.R.D. 148, 157 (C.D.Cal.1983) (same); *Arthur Young & Co. v. U.S. Dist. Court*, 549 F.2d 686, 696 (9th Cir.1977) ("We reach this result not because the individual and reserved issues do not appear real as they concern damages suffered by the class members, but because these damage issues do not, as a rule, defeat class certification in cases such as these"); *Alba v. Papa John's USA, Inc.*, 2007 WL 953849, at *13 (C.D.Cal.2007) ("[I]t is well established that even where the amount of damages must be individually determined, that 'does not defeat class action treatment'") (quoting *Blackie*, 524 F.2d at 905); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 651 (C.D.Cal.1996) ("As for the issue of damages, it seems clear that the fact that plaintiffs will be entitled to different damages does not mean that common questions do not predominate."). As one district court explained, individualized issues of damages cannot be said to predominate merely because the calculation of individualized damages would occupy more time than the resolution of common issues at trial:

> In determining "predominance," defendants attempt to establish as a test the total amount of time which will be spent on proof of the common issue of conspiracy in a class action compared to time spent on individual damage and fraudulent concealment proof in the trial of the same class action. They thus argue that the question of conspiracy does not predominate. If this be the correct approach to the question, arguably it is true that as a class action more time in total will be spent in proof of individual damage claims in any of the class actions than will be spent in proof of conspiracy. Following defendants' line of reasoning, it would seem, however, that the situation should be considered and compared to that which would exist were no class action to be allowed. So for instance, if there were to be but a single case

> for trial, the court would expect that the great bulk of the time of that trial would be consumed with proof or the attempted proof of the existence and effect of a conspiracy and that the fraudulent concealment and damage issues would be far less predominant in the sense of time consumed at the trial. Were there to be 500 separate suits, this same pattern undoubtedly would prevail as to each. It seems specious and begging the question to say that if these 500 law suits were brought into a class so that proof on the issues of conspiracy need be adduced only once and the result then becomes binding on all 500, that thereby the common issue of conspiracy no longer predominates because from a total time standpoint, cumulatively individual damage proof will take longer. Of course, if defendants are upheld in their current posture of denying any conspiracy, then this is clearly the only issue that ever will be tried and certainly it cannot then be gainsayed but that such is the predominant question.

*State of Minn. v. U.S. Steel Corp.*, 44 F.R.D. 559, 569 (D.Minn.1968).

In the context of antitrust cases, numerous courts and treatises have similarly remarked that individual issues concerning damages do not automatically preclude class certification. *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796–98 (10th Cir. 1970) (affirming determination that common issues predominated and explaining that "[t]he fact that there may have to be individual examinations on the issue of damages has never been held, however, a bar to class actions"); *In re NCAA I–A Walk–On Football Players Litig.*, 2006 WL 1207915, at *9 (W.D.Wash.2006) ("In the antitrust context,

'issues of conspiracy, monopolization, and conspiracy to monopolize have been viewed as central issues which satisfy the predominance requirement' … 'individual damage questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class.' ") (quoting Newberg § 18:26–27, at 86–91); Phillip' E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 331d (2d ed. 2000) ("Although the evidence establishing damages usually varies from class member to class member, this fact alone does not defeat certification."); 4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 4.26 (3d ed. 1992) ("A particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damage questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class.").

Despite such general pronouncements that individual issues of damages do not preclude class certification, the Court notes that these cases fail to distinguish between fact of damages/impact and the calculation of the amount of damages. Plaintiffs contend that the holdings of these cases are equally applicable to impact and amount of damages. Defendants argue that the case law should be interpreted as holding that individual issues concerning the amount of damages do not preclude class certification, but individual issues concerning impact may preclude class certification.

Although the Ninth Circuit does not appear to have addressed this precise issue, other circuits have adopted Defendants' position. For example, the Fifth Circuit has held that "where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atlantic Corp. v. AT & T Corp.,* 339 F.3d 294, 302–303 (5th Cir.2003). Similarly, the Third Circuit has held that "[w]hile obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss on a common basis." *Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 259 F.3d

154, 189 (3d Cir.2001); *see also Blades v. Monsanto Co.,* 400 F.3d 562, 571 (8th Cir. 2005) (denying certification where "not every member of the proposed classes can prove with common evidence that they suffered impact," because "[t]he ability to use common evidence to show impact on all class members cannot always be assumed"); 8 von Kalinowski et al., *supra,* § 160.03[3][a] ("In antitrust cases, courts are more likely to consider the critical issue to be whether common liability issues predominate and to disregard individual damages (although not impact) questions."). Absent clear precedent from the Ninth Circuit, the Court will apply the holdings of the Third and Fifth Circuit.

Thus, if individual issues concerning fact of damages predominate, class certification is precluded. However, class certification will not be precluded merely because calculations regarding the quantum of damages involve individual questions. *See, e.g., Bradburn Parent/Teacher Stores, Inc. v. 3M,* 2004 WL 1842987, at *12 (E.D.Pa.2004) ("[I]t is well settled that, if impact can be established by the use of common proof, the fact that individualized determinations of the amount of the damages that each individual class member suffered will be needed does not, in itself, preclude class certification.") (citing *In re Mercedes–Benz Antitrust Litig.,* 213 F.R.D. 180, 190 (D.N.J.2003)) (collecting cases).

### b. *Proof of Fact of Damages/Impact Will Involve Common Evidence*

As discussed above, fact of damage involves two intertwined questions: (1) whether "the plaintiff suffered some loss in his business or property," and (2) whether "there is a casual relationship between the violation and the loss." *Bogosian,* 561 F.2d at 454; *see also MetroNet,* 329 F.3d at 1008 (same). "Any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case." *Bogosian,* 561 F.2d at 454. "The fact of injury may be proved by inference of circumstantial evidence." ABA Section of Antitrust Law, Antitrust Law Developments (5th ed.2002) at 870 (citing numerous cases including: *Zenith,* 395 U.S. at 125, 89 S.Ct. 1562; *Continental Ore Co. v. Union Carbide & Carbon*

*Corp.*, 370 U.S. 690, 700, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). Fact of damage can be established on a common basis "so long as the common proof adequately demonstrates some damage to each individual." *Bogosian*, 561 F.2d at 454.

Plaintiffs argue that fact of damage can be proved through common evidence. At the hearing, Phillips testified that he could determine whether Clear Channel imposed a monopoly overcharge through a variety of methods. First, Phillips testified that he could use the relevant market in 1999 as a benchmark because Clear Channel possessed a small market presence in 1999 and its ticket prices were comparable with competitors' ticket prices in 1999.[32] (Hearing Tr. at 39:25–40:19.) Second, Phillips testified that he could use the ticket prices for other promoters as a benchmark.[33] (*Id.*) Phillips explained that Clear Channel's concert ticket prices began to diverge from the prices charged by other promoters in August 2000 once Clear Channel acquired SFX and AM/FM. (*Id.*) Phillips stated that by October 2002, Clear Channel's ticket prices were approximately 30% higher than the rest of the market. (*Id.*) Finally, Phillips testified that he could perform a regression analysis to control for artist quality and other factors in evaluating impact.[34] (Hearing Tr: at 39:25–40:19.) Specifically Phillips explained that the Pollstar data would allow him to perform "cross sectional time series analysis" of prices in each template market to determine whether, and by how much. Clear Channel's prices are above the rest of the market. (Phillips Report ¶ 76.) Phillips also stated that he could account for differences in the artist or concert through the use of a "fixed effects approach" through the insertion of dummy variables into the regression analysis.

While some older cases have noted the difficulty in proving class-wide impact in monopolization cases,[35] in more recent cases circuit and district courts have determined that impact can be demonstrated through common evidence based on the use of methodologies similar to those proposed by Phillips. For example, in *In re Linerboard Antitrust Litigation,* the Third Circuit accepted the professional opinions, authenticated by "supporting data, including charts and exhibits," of plaintiffs' expert witnesses that plaintiffs "could establish injury on a class-wide basis." 305 F.3d 145, 155 (3d Cir.2002). The panel affirmed the lower court's decision to not "require the experts to pick one particular method over another at the class certification stage, recognizing that the certification stage is early in the overall litigation process." *Id.*

Additionally, *In re Rubber Chemicals Antitrust Litig.,* the district court explained that the plaintiffs' economics expert proposed "a correlation analysis as a method for demonstrating common impact that has been upheld by numerous courts." 232 F.R.D., 346, 353 (N.D.Cal.2005) (citing *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019 (N.D.Miss. 1993)). Although the defendants' expert criticized the correlation analysis, the court stated that "[t]he certification stage of this litigation is not ... the proper forum in which to resolve this battle [of the experts]." *Id.* (quoting *Potash,* 159 F.R.D. at 697). The court found that the plaintiffs had presented a realistic method of proving common impact and therefore the court concluded that indi-

---

**32.** This approach is commonly referred to as the "before-and-after" approach.

**33.** This approach is commonly referred to as the "yardstick" approach.

**34.** The Ninth Circuit explained in *Dukes* that a regression analysis can be used to estimate the extent to which an independent variable has influenced a dependent variable. *Dukes,* 474 F.3d at 1228 n. 4.

**35.** *See, e.g., San Antonio Tel. Co., Inc. v. American Tel. & Tel. Co.,* 68 F.R.D. 435, 438 (W.D.Tex. 1975) ("It should be pointed out that in the abstract a monopoly does not ipso facto cause injury or damage ... whether a monopoly causes damage to an individual in his business such that he may bring an action therefor and recover monetary or equitable relief pursuant to the [Clayton Act] is a factual determination to be made on each individual case."); *Dafforn v. Rousseau Associates, Inc.,* 1976 WL 1358, at *4 (N.D.Ind. July 27, 1976) ("Monopolization is a per se violation of the antitrust laws; so is price-fixing. A per se violation does not, however, ipso facto establish the fact of injury.") (citations omitted).

vidualized issues regarding impact do not predominate over common issues. *Id.* at 354.

Similarly, in *J.B.D.L. Corp. v. Wyeth–Ayerst Laboratories, Inc.*, plaintiff's expert proposed that antitrust impact could be demonstrated through the use of common evidence and methodologies. 225 F.R.D. 208, 217–18 (S.D.Ohio 2003). Plaintiff's expert explained that class-wide impact could be proved through governmental and academic studies, internal forecasts, standard microeconomic theory about monopoly pricing, and the actual marketplace behavior of similar products. *Id.* at 217. The defendants argued that individual issues would predominate over common issues and that the proposed methodologies were fatally flawed. *Id.* at 218. The court held that the plaintiffs had demonstrated "a colorable method for demonstrating class-wide impact" regardless of whether the proposed methods of proof of impact were ultimately meritorious. *Id.* at 219. Therefore, the court concluded that common issues would predominate over individual issues. *Id. See also Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 143 (D.N.J.2002) (observing that courts have "recognized the validity" of both the yardstick and regression analysis methods for demonstrating class-wide impact); *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, 2006 WL 891362, at *10 (D.N.J. Apr.4, 2006) (finding that plaintiffs produced a plausible theory that class-wide impact may be proved through common evidence where "plaintiffs proposed using multiple regression and benchmark methodologies"); *Bradburn Parent/Teacher Stores, Inc. v. 3M*, 2004 WL 1842987, at *14 (E.D.Pa. Aug.18, 2004) (holding that plaintiff's satisfied their burden of demonstrating the class-wide impact could be proved through common evidence where plaintiffs expert proposed the use of common benchmarking formulas); *Nichols v. SmithKline Beecham Corp.*, 2003 WL 302352, at *8 (E.D.Pa. Jan.29, 2003) (holding that expert's proposed benchmark methodology for calculating antitrust impact was a generally accepted methodology for purposes of determining impact and damages on class-wide basis); *In re Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. 18, 25–29 (N.D.Ga.1997) (finding that plaintiffs satisfied their burden of demon-

strating that they will rely predominantly on common evidence to prove class-wide impact where plaintiffs proposed to rely on a multiple regression analysis).

Although Defendants do not contest that Plaintiffs could utilize such methodology to prove impact in general, Defendants argue that proof of impact will require an individual, case-by-case analysis under these circumstances for several reasons. First, Defendants argue that their alleged anticompetitive conduct could not have caused harm to some class members because some artists set price-ceilings on tickets that were no higher than the competitive price. (Gilbert Report ¶ 40.) Second, Defendants claim that many plaintiffs suffered no injury because they attended sold-out concerts. (Gilbert Report ¶ 40.) Third, Defendants assert that proof of impact requires individualized inquiries because each rock concert constitutes a separate market. Finally, Defendants raise various merits issues in an attempt to prove that some class members suffered no injury.

### 1. Some Artists Impose Price–Ceilings on Ticket Prices

Defendants' expert, Professor Gilbert, states that artists deliberately charge prices for their concerts significantly below market norms. (Gilbert Report ¶ 49.) Gilbert explains that class members who only attended concerts by such performers would have suffered no injury at all. (Gilbert Report ¶ 50.) Thus, Gilbert contends that determining whether a particular class member was injured would require a fourfold inquiry: "(1) what concerts they saw; (2) the preferences of the artists performing the concerts for belowmarket prices; (3) the ability of the artists to impose their preferences; and (4) what the market price would have been for the concert but for the artists' preferences." (Gilbert Report ¶ 50.)

First, there is considerable debate over the extent to which artists negotiate ticket prices or impose price-ceilings. Defendants have also submitted several declarations in support of their argument that artists often dictate ticket prices. For example, Defendants

submit the declaration of Mark Campana, the President of the Midwest Region at Live Nation. (Campana Decl. ¶ 1.) Campana oversees a staff that books artists for live concerts throughout the Midwest, including Chicago. (*Id.*) Campana claims that concert ticket prices are primarily determined by the artists. (*Id.* ¶ 3.) Campana explains that the artist will state how much the artist needs to make on a concert and this "practically predetermines what the final ticket price has to be." (*Id.*) Campana emphasizes that "the artist is the ultimate authority on the final ticket price." (*Id.*) Campana asserts that some artists purposefully set the ticket prices below the competitive price:

> Pearl Jam is an example of a group that, for social reasons or otherwise, caps their ticket prices under $80. Each set in the first 10 rows of a Pearl Jam concert could easily sell for $1,000, but Pearl Jam insists on the lower price. When you factor in that Pearl Jam concerts are sold out in a matter of hours and there are thousands of people willing to pay hundreds of dollars or more for tickets in the secondary markets, I know that Pearl Jam left a lot of money on the table. Other artists who have a similar pricing strategy are Tool, Foo Fighters, Jack Johnson, Bruce Springsteen, and Ben Harper.

(Campana Decl. ¶ 6.) *See also* (Kessler Decl. ¶ 7) ("I believe that bands like Pearl Jam, The Cure, and Bright Eyes make a social decision to keep their ticket prices below what they could obtain.")

Defendants also submit a declaration by James Guerinot who is the owner and president of an artist management firm which has managed artists including The Offspring, Gwen Stefani, and Nine Inch Nails. (Guerinot Decl. ¶ 1.) Similar to Campana, Guerinot insists that ticket prices are largely determined by the artists. (*Id.* ¶¶ 2–6.) Guerinot states that his experience in negotiations with Live Nation has been that Live Nation tries to encourage artists to charge lower ticket prices so that Live Nation can recoup "more money on beer, parking, and popcorn." (*Id.* ¶ 8.) Guerinot also notes that some groups, such as The Offspring, insist on setting ticket prices below what Guerinot

believes the groups could command. (*Id.* ¶ 9.) The director of theatre booking for the New England Region of Live Nation, the manager of Depeche Mode, the president for the Rocky Mountain region of Live Nation, and the vice president of booking for Southern California for Live Nation similarly explain that artists dictate the price for concert tickets. (Innamorato Decl. ¶¶ 1, 3–12); (Kessler Decl. ¶¶ 1, 3–4, 6); (Lavoisne Decl. ¶¶ 1, 3–4) (Best Decl. ¶¶ 2–7.) Finally, Defendants, submit contracts for concert agreements with various artists in an attempt to show that "each concert originates from a unique set of agreements between Live Nation/CCE and an artist or artists' representative." (Pak Decl. ¶ 5, Exs. 3–9.)

However, Plaintiffs contend that this phenomenon occurs relatively infrequently. At the hearing Phillips testified that he has reviewed hundreds of contracts between artists and promoters and very few contracts specify ticket caps. (Hearing Tr: at 66:16–20.)

Second, even assuming that artists impose ticket price-ceilings when they negotiate contracts with Clear Channel, it is incorrect to assume that class members do not pay more than the price-ceiling. Plaintiffs submitted concert promotion deal sheets for various artists reflecting that Clear Channel imposed various fees and surcharges on top of the ticket prices negotiated with the artists. *See* (Pl.'s Hearing Ex. K) (concert promotion deal sheet for John Mellencamp showing Clear Channel's imposition of facility maintenance and parking fee is not included in "gross box office receipts" used to calculate artist's fees); (Pl.'s Hearing Ex. R) (concert contract for Ray Davies showing that Clear Channel's imposition of facility fee is not included in "net box office receipts" used to calculate artist's fees); (Pl.'s Hearing Ex. L) (concert promotion deal sheet for Panic at the Disco showing Clear Channel's imposition of facility maintenance fee is not included in "gross box office receipts" used to calculate artist's fees); (Def.'s Hearing Ex. 6) (Hootie and the Blowfish contract stating that facility maintenance and parking fees are deducted before computing gross ticket receipts); (Pl.'s Hearing Ex. J) (Clear Channel memo showing

that Clear Channel imposed a ticket surcharge on each ticket sold through Ticketmaster). *See also* (Walker Depo. at 13–62) (former head of North American Music for Live Nation explaining that artists' agents often set parameters for ticket prices but ticket prices are determined by a variety of factors). Through the imposition of such surcharges, it is possible for Clear Channel to effectively raise ticket prices above price-ceilings allegedly imposed by artists.

Finally, even if consumers pay no more than the price-ceiling set by the artist, this fails to demonstrate whether the ticket price was surpacompetitive. Gilbert's argument boils down to the claim that Clear Channel's anticompetitive conduct could not have caused harm to ticket purchasers if the artist dictated the ticket price. However, as Phillips testified at the hearing, the fact that an artist places a cap on ticket prices does not mean that the price is competitive. This is because "[e]ven when price caps are set, the price cap can be above the competitive price." (Tr. 48:17–24.) "[It] just means that they are not letting Clear Channel charge an even higher price than the price that is being charged for the tickets." (Tr. 45:7–15.)

Therefore, Clear Channel's argument that the imposition of a price-ceiling eliminates

any potential for injury is incorrect. If the artist negotiates a supracompetitive ticket price, the fact that the artist demands the price does not immunize Clear Channel's conduct because it is Clear Channel's alleged anticompetitive conduct which allows the setting of monopoly prices.[36] Thus, antitrust impact still exists so long as the price is above the competitive level. Conversely, no impact exists if the artist demands that the price be set below the competitive level. The key insight is that whether or not the price is set above or below the competitive level can only be determined through one of the methodologies proposed by Plaintiffs' expert (yardstick approach, before-and-after approach, or regression analysis). Thus, whether or not an artist negotiated or dictated the price of the tickets is irrelevant to whether Clear Channel charged a supracompetitive price for the concert tickets. As a result, it will not be necessary to engage in an analysis of each artist's negotiations with Clear Channel to prove or disprove impact.[37]

### 2. Some Concerts Are Sell–Outs

Defendants' expert, Professor Gilbert, states that sold-out concerts by definition have "a price no higher than the competitive

**36.** Although Plaintiffs' theory is not always precisely articulated, it appears to be as follows. First, all rock concerts fall within a single product market and are reasonable substitutes. Second, in a competitive market with multiple promoters, a promoter cannot charge supracompetitive ticket prices because consumer demand will shift to other concerts and the promoter would lose revenue. Consequently, promoters would not cede to an artist's demand to charge supracompetitive ticket prices because promoters would be better off charging a competitive price for an artist that is a substitute. However, Plaintiffs allege that Clear Channel possesses monopoly power and therefore Clear Channel can set supracompetitive prices. In other words, by eliminating competing promoters, ticket prices for rock concerts are no longer constrained.

**37.** A district court rejected a similar argument in *J.B.D.L. Corp.,* 225 F.R.D. at 218. In *J.B.D.L. Corp.,* purchasers of a prescription drug brought an antitrust class action against the drug manufacturer alleging restraint of trade and monopolization. *Id.* at 210. As discussed above, plaintiffs' expert claimed that antitrust impact could be demonstrated on a class-wide basis through

the use of common evidence and methodologies. *Id.* at 217–18. The defendants argued that the impact analysis involved individual questions because some purchasers negotiated discounts and thus class members paid different prices for the drug. *Id.* Applying a rationale similar to the Court's reasoning, the court rejected the defendants' argument:

> [T]he fact that some direct purchasers may have purchased Premarin at a price achieved through individual negotiations does not affect the common impact analysis because [defendant's] alleged anticompetitive conduct artificially raised the base price for Premarin on which discounts were based. Thus, any variation in the price actually paid for Premarin by the sundry direct purchasers is really a matter of calculation of individual damages as opposed to evidence showing that impact of the alleged anticompetitive conduct was not common among direct purchasers.

*Id.* at 218. *See also In re Bromine Antitrust Litigation,* 203 F.R.D. 403, 414 –415 (S.D.Ind. 2001) (finding that defendant's "arguments that substantial buyer power and variation in prices preclude finding that common issues predominate is a red herring").

price that would equate supply and demand for that venue." (Gilbert Report ¶ 51.) Gilbert explains that class members who only attended such sold-o ut concerts would have suffered no injury at all. (Gilbert Report ¶¶ 51, 53.) Defendants contend that a large number of rock concerts are sell-outs, and therefore a large number of class members suffered no injury.[38]

Defendants' conclusion is correct if the market for rock concerts is presumed to be perfectly competitive.[39] However, Plaintiffs allege that Clear Channel possesses monopoly power in the rock concert market. By definition, a monopolist selects a price and output where the price exceeds marginal revenue and marginal cost. Therefore, the price is not set at a competitive level even though the quantity demanded equals the quantity produced by the monopolist.[40]

Thus, Gilbert's conclusion is apparently premised on the assumption that Clear Channel has no control over the size of the venue. Accordingly, Gilbert reasons that Clear Channel cannot select a level of output like a typical monopolist. However, Plaintiffs allege that Clear Channel in fact has control over the selecting the size of a concert venue. For example, Phillips lists in detail the various venues which Clear Channel controls in the Denver market. (Phillips Decl. ¶¶ 53–58.) Thus, just as any other monopolist reduces output below the competitive level to charge a supracompetitive price, Plaintiffs contend that Clear Channel artificially restricts the supply of tickets for rock concerts through the selection of smaller venues in order to charge supracompetitive prices.[41] Therefore, a "[s]ell-out by no means suggests competitive behavior." (Phillips Rebuttal Report at 11.)

The significance of this analysis is that the Court cannot simply assume that numerous potential class members suffered no injury because they attended sold-out concerts. Thus, similar to the fact that the imposition of price-ceilings does not demonstrate whether the ticket price is competitive, the existence of a sell-out does not demonstrate whether the ticket price is competitive. Whether or not the price is set above or below the competitive level can only be determined through one of the methodologies discussed above, which obviously must take into account venue considerations.

38. There is a substantial dispute over the extent to which rock concerts sell-out. Gilbert states that 27% of the tickets purchased for rock concerts promoted by Clear Channel during the class period were for sold-out concerts. (Gilbert Report ¶¶ 51, 53.) However, Plaintiffs have produced evidence that sell-outs are relatively rare occurrences. For example, Clear Channel's "Music Division Strategic Plan" for July 2002 states that the total number of Clear Channel amphitheatre sellouts dropped to 139 in 2001 from 213 in 2000. (Pl.'s Supp. Ex. 1. LN 00–1267.) The plan also states that the "large majority of [Clear Channel] shows are not sell-outs." (Pl.'s Supp. Ex. 1. LN 001313.)

39. In a perfectly competitive market, the aggregate supply curve represents the sum of the individual firms' marginal cost curves, and the aggregate demand curve represents total market demand. The equilibrium price is determined by the intersection of the aggregate supply and demand curves. This equilibrium price becomes the marginal revenue curve for each firm because each firm is a price taker. Because firms select an output where marginal costs equal marginal revenue, price equals marginal cost at the equilibrium level of output in a competitive market. In other words, price = MR = MC. *See* Lipsey, Richard G. et al., *Microeconomics,* 232–36 (12th ed.1998).

40. While both monopolists and competitive firms select an output where marginal revenue equals marginal cost, price does not equal marginal cost for a monopolist. This is due to the fact that as the sole producer, a monopolist's demand curve is the market demand curve for the product. As a result, a monopolist faces negatively sloped demand and marginal revenue curves while a perfectly competitive firm faces a constant marginal revenue curve. While the monopolist selects a level of output where marginal revenue equals marginal cost, the price is determined by the intersection of this level of output and the demand curve. Therefore, a monopolists' marginal revenue and marginal cost is less than the price at which it sells its output. Lipsey, *supra,* at 232–36.

41. Defendants contest the allegation that Clear Channel controls selection of the venue. For example, the vice president of booking for Southern California for Live Nation states that "the artist makes the final choice on venue" and explains that "[m]ost artists know the venues available in Los Angeles and have very strong ideas about the ones that they like and the ones in which they will not play." (Best Decl. ¶ 9.)

As discussed in more detail below, Plaintiffs may ultimately fail in proving impact. However, for purposes of Plaintiffs' motion for class certification, the Court's focus is whether or not common evidence and methodologies can be used to demonstrate impact. As demonstrated above, the existence of sellouts does not preclude the use of common evidence and methodologies to prove impact.

Finally, to the extent that Defendants might ultimately demonstrate on the merits that some class members were not harmed because they only attended sold-out shows, this does not preclude class certification. *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. at 353; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D.Mich.2001) ("Even if Plaintiffs could not show injury-in-fact as to a few class members, this would not be fatal. The courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class."); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y.1996) (observing that "[t]he fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing [generalized damage] as to all."); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 225 (E.D.Mich.2002) ("[I]t is not necessary, at the class certification stage, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry."); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 347 (E.D.Pa.1976) ("The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones."); *J.B.D.L. Corp.*, 225 F.R.D. 208, 218 (S.D.Ohio 2003) ("[T]he record thus far demonstrates that the direct purchasers who allegedly [suffered no injury] is a small percentage of the entire class, and this fact does not defeat class certification.").

### 3. Existence of Individual Markets

Gilbert claims that whether the challenged conduct affected the prices of each concert would require an individualized concert-by-concert inquiry. (Gilbert Report ¶ 39.) Gilbert's conclusion is based on the reasoning that "some challenged action by Clear Channel directed at a particular artist can at most affect the prices of concerts by that artist and the prices of concerts that are close substitutes to the concerts of targeted artists." (Gilbert Report ¶ 41.) For example, Gilbert explains that if Clear Channel targeted Rush with threatened withholding of airplay or venue access which led to an elevation in ticket prices, there could possibly be injury to class members who purchased Rush tickets. (Gilbert Report ¶ 44.) However, Gilbert emphasizes that purchasers of Pearl Jam tickets would be uninjured because consumers allegedly do not view Rush and Pearl Jam as close substitutes. (Gilbert Report ¶ 45.)

This argument lacks merit because it is based on the assumption that the Court will determine that each concert constitutes a separate product market. As discussed in Part V.D.1.i.c, market definition is typically a jury question. Given that the case will likely be bifurcated, if Plaintiffs fail to prove that the product market should be defined as all rock concerts at trial, liability will not be established and it will be unnecessary to even reach the issue of impact.

### 4. Merits Arguments about Impact

Defendants also raise several arguments in attempting to prove that many class members suffered no injury. For example, Defendants submitted an expert report prepared by Professor Jerry A. Hausman.[42] Hausman claims that Phillips has failed to demonstrate that Clear Channel's anti-competitive conduct caused harm to consumers:

> Prof. Phillips presents average ticket price data that demonstrates that average ticket prices increased significantly faster than

---

**42.** Hausman is a Professor of Economics at the Massachusetts Institute of Technology. (Hausman Report ¶ 1.) Among other positions, Hausman has been a consultant for firms in the music industry, including Clear Channel, for the past ten years. (*Id.* ¶¶ 2–7.)

the Consumer Price Index (CPI) over the period 1996–2000 ... Prof. Phillips presents no economic or econometric analysis that demonstrates that these price increases arose from Clear Channel's assumed anti-competitive conduct rather than other factors, such as top artists demanding higher payments to give live concerts. One of the most famous sayings in econometrics (and statistics) is: 'correlation does not prove causation.' Prof. Phillips has not provided any econometric analysis beyond a purported correlation of Clear Channel's conduct and an increase in ticket prices ... Prof. Phillips has found a correlation (increasing ticket prices and Clear Channel ownership), but he has not demonstrated the economic linkage between the two sets of events in order to establish causation.

(Hausman Report ¶¶ 15–16.)

As an example of the difference between correlation and causation, Hausman cites the oft-quoted observation that at the end of World War II in Belgium, the number of storks increased as did the number of babies. (*Id.* n. 2) Hausman explains that "most [people] do not think that storks cause babies." (*Id.*) While Hausman's observation is certainly correct, the Court is not permitted to weigh the merits of the case at the class certification stage. Thus, if the issue of whether storks caused babies were the subject of litigation, the Court would not be permitted to determine whether storks indeed caused babies at the class certification stage. Instead, the Court would be required to presume that the substantive allegations were true, and wait until summary judgment or trial to resolve the issue *Blackie*, 524 F.2d at 901 n. 17. Similarly, the Court is not permitted to weigh evidence related to causation at the class certification stage even if the Court believes that Plaintiffs' claims will ultimately fail in subsequent proceedings. The dispositive issue for purposes of class certification is whether impact can be proved through the use of common evidence and methodologies.

Second, Hausman argues that class-wide antitrust impact does not exist. (Hausman Report ¶ 17.) Hausman explains that consumers can be impacted by anti-competitive conduct through either changes in price or changes in quality. (Hausman Report ¶ 17.) While Hausman admits that an increase in price can harm consumers, Hausman cautions that sometimes an increase in price simply represents an increase in quality. (Hausman Report ¶ 18.) Specifically, when the price of a product increases and the quality of the product is held constant, the increased price causes movement along the demand curve. (Hausman Report ¶ 18.) However, when the quality of a product increases, Hausman states that consumers will buy more of the product. (Hausman Report ¶ 18.) This increase in demand causes an outward shift in the demand curve, resulting in increases in both price and quantity demanded. (Hausman Report ¶ 18.) Therefore, Hausman explains that "[t]he net effect of a simultaneous increase in price and increase in quality can be quite complicated to ascertain and is likely to vary across individuals." (Hausman Report ¶ 18.) Hausman concludes that the possibility that price increases were coupled with quality increases shows that common proof is not sufficient to demonstrate class-wide impact. (Hausman Report ¶ 20 n. 8.)

For example, Hausman claims that average ticket prices for concerts for the "top 100 acts" increased by over 50% between 2000 and 2006. (Hausman Report ¶ 19.) Hausman also notes that total number of tickets sold increased between 2000 and 2005. (Hausman Report ¶ 19.) Hausman concludes that "[e]ven though prices increased significantly, quality must have also increased significantly because the number of tickets sold did not decrease." (Hausman Report ¶ 19.) Therefore, Hausman reasons that while some people were made worse off by the price increase, "other individuals, who replaced the individuals who would have gone if prices were lower, were made better off by the increase in quality and decided to attend a concert." (Hausman Report ¶ 20.)

Hausman's conclusion is flawed in several respects. First, Hausman uses two different sets of data in his analysis: he uses data from the top 100 acts to determine that prices increased, but he uses data from all concerts to determine that the amount of

tickets sold increased. Second, analyzing similar data, Professor Alan B. Krueger calculated that the number of concerts declined by 16% between 1996 and 2003. Krueger, Alan B., *The Economics of Real Superstars: The Market for Rock Concerts in the Material World*, 23 Journal of Labor Economics 1, 12 (2005). Krueger also observed that the number of tickets sold to concerts has decreased since 2000. *Id.* Specifically, around thirty million concert tickets were sold each year from the late 1980s to 2000. *Id.* However, Krueger found that the number of tickets sold began dropping in 2000 until 2003 when only twenty-two million tickets were sold. *Id.* Moreover, Krueger observed that the percentage of tickets sold out of the available tickets decreased from around 90% in the late 1980s to around 75% in 2003. *Id.* Thus, Krueger states that "it seems that price growth is affecting demand for tickets." *Id.* Krueger later concludes that "[t]hese trends are inconsistent with a demand-side shift in the face of a stable supply curve." *Id.* at 15. Krueger also contests Hausman's conclusion that the quality of rock concerts must have increased. Krueger, Alan B., *The Economics of Real Superstars: The Market for Rock Concerts in the Material World*, 23 Journal of Labor Economics 1, 6 (2005) ("While many economists believe that the [consumer price index] overstates the rise in cost of living because of unmeasured quality improvements, hardly any economist I know believes the quality of rock & roll music has improved.")

Fourth, Phillips explains that population growth could be a major reason for the increased demand. (Phillips Rebuttal Report at 15.) Even if nationwide population growth is minimal, Phillips explains that population growth in various metropolitan areas often grows at a much higher rate. For example, Phillips states that some of the Denver metro areas have had annual population growth in excess of 10% since 1990. (*Id.*) Finally, Hausman also admits that "[h]ypothetically, anti-competitive behavior could include both an increase in price and a decrease in quality." (Hausman Report ¶ 25 n. 15.)

Regardless of any potential flaws in Hausman's analysis, the Court cannot consider Hausman's claims because they relate to the merits. The Court's role is to determine whether impact can be demonstrated through common evidence—not whether Plaintiffs will succeed in proving impact on the merits.[43]

Defendants also submitted an article written by Professor Alan Krueger about the market for rock concerts. *The Economics of Real Superstars: The Market for Rock Concerts in the Material World*, 23 Journal of Labor Economics 1 (2005). Using the *Pollstar* database; Professor Alan Krueger calculated the average price for a concert ticket between 1981 and 2003. *Id.* at 6. Between 1981 and 1996, Krueger found that concert prices grew slightly faster than inflation. *Id.* However, between 1996 and 2003, Krueger found that concert ticket prices grew at a much faster rate than inflation. *Id.* Krueger ruled out cost increases and a shift in composition as causes of the divergence in prices. *Id.* at 8–9. Additionally, Krueger observed that while concert price growth tracked price growth for other entertainment events between 1981 and 1996, the growth rate for concert ticket prices started diverging in 1997. *Id.* at 8.

After conducting a regression analysis, Krueger ultimately expresses skepticism that Clear Channel's horizontal and vertical concentration was a "major reason for the hike in concert prices." *Id.* at 25. Krueger explains that "[a]lthough anecdotal evidence abounds-and the rising prices and declining ticket sales documented [earlier in the paper] are certainly consistent with the exercise of greater monopoly power after the mid–1990s–I have found it surprisingly difficult to find clear evidence linking Clear Channel to the exorbitant growth in concert ticket prices." *Id.* at 23.

However, Phillips points out two major flaws in Krueger's assertion that he cannot find a significant relationship between Clear Channel's market concentration and the in-

---

**43.** Additionally, Phillips testified that his impact analysis could control for differences in quality

through the use of various regression techniques.

creases in ticket prices. First, Phillips claims' that Krueger's analysis fails to cover all of the names/affiliations under which Clear Channel does business. (Phillips Rebuttal Report at 19.) For example, Phillips states that even after Clear Channel acquired the Denver promoters Jacor and SFX, Jacor and SFX continued to be listed as promoters in the Pollstar data set. (*Id.* at 18.) Second, Phillips points out that Krueger's analysis ends in 2001. Plaintiffs' allege that Clear Channel's dominance through acquisitions began in August 2000. Therefore, Phillips explains that it is not surprising that a relationship would not yet have manifested in the data analyzed by Krueger. (*Id.* at 18.)

Regardless of whether such arguments might succeed on the merits, the Court cannot resolve these issues at this stage in the litigation. "The operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members." *In re Bulk (Extruded) Graphite Products Antitrust Litig.,* 2006 WL 891362, at *10 (D.N.J. Apr.4, 2006). *See also Dukes,* 474 F.3d at 1229 ([O]ur job on this appeal is to resolve whether the "evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive' to the trier of fact.") (quoting *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 135); *Bradburn Parent/Teacher Stores, Inc. v. 3M,* 2004 WL 1842987, at *14 (E.D.Pa. Aug.18, 2004) ("Plaintiff is not required at [the class action] stage of the litigation to establish, as fact, that each class member has suffered economic injury."); *Lumco Indus., Inc. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 173–74 (E.D.Pa.1997) ("At this stage of litigation, however, the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law,"); *In re*

*Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 618 (N.D.Ga.1997) ("Plaintiffs must show that antitrust impact can be proven with common evidence on a class-wide basis; Plaintiffs need not show antitrust impact in fact occurred on a class-wide basis"); *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 326, 340 (E.D.Mich.2001) ("To show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member."); *In re Hydrogen Peroxide Antitrust Litigation* 240 F.R.D. 163, 174 (E.D.Pa. 2007) ("Defendants are correct that plaintiffs must establish that each class member has, in fact, been injured by the alleged conduct. They do not, however, have to prove it prior to class certification. All they need demonstrate now is that antitrust impact on each member is susceptible to proof by predominantly common evidence.") (quotation and citation omitted).

The Court finds that Plaintiffs have demonstrated that several generally accepted methodologies can be used to prove class-wide impact through the use of common evidence. Additionally, the Court finds that Defendants' experts have not shown that the alleged imposition of price ceilings or existence of sell-outs will inject sufficient individual questions of law or fact that common questions will cease to predominate. The Court's determination does not reflect how it might resolve the issue of impact on the merits at a later date.[44] However, Plaintiffs showing is sufficient for the Court to conclude that common issues of law and fact will predominate with respect to impact.

### c. Calculating the Amount of Damages Involves Common Evidence and Methodologies

"The required quantum of proof necessary to prove the amount of damages is less than that required to prove the fact of damages."[45] *Blanton v. Mobil Oil Corp.,* 721

---

44. For example, Plaintiffs might not even succeed in qualifying Dr. Phillips as an expert. However, "courts need not apply the full Daubert 'gate-keeper' standard at the class certification stage." *Dukes,* 474 F.3d at 1227.

45. The district court in *Knutson* summarized the rationale for imposing a lower burden of proof on the amount of damages:

There are two reasons why plaintiff's burden of proving the amount of damages is relaxed in

F.2d 1207, 1215–16 (9th Cir.1983). Proof is sufficient "if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir.1976) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). "In other words, an antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir.1982) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). "The essential requirement is only that plaintiffs develop a reasonable theory for calculating the amount of damages and that they introduce the data necessary to make this calculation." *Knutson v. Daily Review, Inc.*, 468 F.Supp. 226, 229–230 (C.D.Cal.1979); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590, at *5 (N.D.Ill. Nov.18, 1994) (finding that the plaintiffs satisfied the court that a class-wide formula for proving damages exists where "plaintiffs have come forward with seemingly realistic methodologies for proving damages on a class-wide basis.")

Plaintiffs' expert, Dr. Phillips, has proposed several methodologies by which damages can be calculated on a class-wide basis. First, Phillips testified that he could use a before-and-after approach. Phillips explained that he would use the relevant market in 1999 as a benchmark because Clear Channel possessed a small market presence in 1999 and its ticket prices were comparable with competitors' ticket prices in 1999. (Hearing Tr. at 39:25–40:19.) This before-and-after methodology has been accepted by numerous courts. *See, e.g., In re Dynamic Random Access Memory Antitrust Litig.*, 2006 WL 1530166, at *9, 2006 U.S. Dist.

LEXIS 39841, at *45–46 (N.D. Cal. June 5, 2006) (citing *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, 1996 U.S. Dist. LEXIS 16409 (N.D.Cal. Oct. 2, 1996)) (noting that the before-and-after methodology has been "upheld by numerous courts"); *Bradburn Parent/Teacher Stores, Inc. v. 3M*, 2004 WL 1842987, at *14–18 (E.D.Pa. Aug.18, 2004) (holding that plaintiffs satisfied their burden of demonstrating that class-wide impact could be proved through common evidence where plaintiff's expert proposed the use of a before-and-after methodology); *Nichols v. SmithKline Beecham Corp.*, 2003 WL 302352, at *8 (holding that before-and-after methodology for calculating antitrust impact is a generally accepted methodology for purposes of determining impact and damages on class-wide basis).

Second, Phillips testified that he could use the yardstick approach in which the ticket prices for other promoters act as a benchmark. (*Id.*) This approach is also widely upheld by courts. *See, e.g., In re Dynamic Random Access Memory Antitrust Litig.*, 2006 WL 1530166 at *9, 2006 U.S. Dist. LEXIS 39841 at *45–46 (citing *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D.Pa.2001)) (noting that the yardstick methodology has been "upheld by numerous courts"); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. at 354 (finding that the yardstick approach is a "reasonable and commonly-used formulaic [approach] to calculating damages"); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 143 (D.N.J.2002) (observing that courts have "recognized the validity" of the yardstick analysis method for demonstrating class-wide impact).

Finally, Phillips testified that he could perform a regression analysis to control for artist quality and other factors in evaluating impact. (Hearing Tr: at 39:25–40:19.) Regression analysis is a well-recognized tool in determining antitrust damages. *See, e.g.,*

an antitrust case: first, the self-evident intangible nature of the subject matter; and second, the recognition that most difficulties in computing antitrust damages arise as a result of defendant's own wrongful conduct.... [If Defendants were] permitted to argue that inexact and imprecise damages are improper ... potential defendants would be encouraged to act in a manner that would render damages as uncertain and speculative as possible, and this would of course undercut the policies underlying the antitrust laws.
*Knutson v. Daily Review, Inc.*, 468 F.Supp. 226, 229 (C.D.Cal.1979).

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1237–39 (3d Cir.1993) (admitting multiple regression analysis for use in calculating antitrust damages); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 175 (E.D.Pa. 2007) ("when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation," citing *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D.Pa.1999)); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 143 (D.N.J.2002) (observing that courts have "recognized the validity" of the regression analysis method for demonstrating class-wide impact). Therefore, the Court finds that Plaintiffs have proposed generally-accepted methodologies for calculating damages that would involve the use of common evidence.

However, Defendant's expert, Dr. Hausman, argues that Phillip's proposed econometric approach to calculating damages is flawed in several respects. First, Phillips states that Hausman's 1981 paper about consumer surplus[46] provides "a well received estimation method of consumer surplus (compensating variation) using the estimated parameters of an ordinary demand function." (Phillips Report ¶¶ 75–77.) However, Hausman contends that the technique discussed in his 1981 paper is inapplicable to the present circumstances. (Hausman Report ¶ 30.) Hausman explains that his technique was developed to study the demand for gasoline. (*Id.*) In contrast to brands of gasoline, which have very little differentiation, Hausman asserts that various rock concerts are highly differentiated. (*Id.*) Thus, Hausman claims that Phillips would have to develop econometric techniques "to permit estimation over the entire group of concerts a consumer chooses from." (*Id.*)

Second, Hausman points out that Phillips has conceded that there are several problems he would need to overcome to estimate damages using an econometrics analysis. (Hausman Report ¶ 31.) These problems include differing quality across concerts, changes in market size, shifts of the demand curve, and changes in the competitive outcome in terms of quantity. (Hausman Report ¶ 31) (citing Phillips Report ¶ 74.)

Third, Hausman contends that Phillips fails to take into account supply-side effects in determining the extent of ticket price increases which were caused by the alleged anti-competitive conduct. (Hausman Report ¶ 32.) Hausman contends that a change in supply side conditions likely caused the increase in rock concert ticket prices. (*Id.*) (citing Alan B. Krueger, *The Economics of Real Superstars: The Market for Rock Concerts in the Material World*, 23 Journal of Labor Economics 1, 17 (2005)).

Fourth, Hausman claims that Phillips has incorrectly excluded certain variables such as "specific talent effects" from his analysis because such variables are "potentially unobservable." (Hausman Report ¶ 35) (quoting Phillips Report ¶ 76.) Hausman contends that such variables are correlated with price and therefore the results of the econometric model will be biased and unreliable if the variables are excluded. (Hausman Report ¶ 35.) Also, Hausman argues that Phillips' approach is unreliable because Phillips has not performed the actual econometric analysis in order to know whether his approach would be valid. (*Id.*) (quoting Phillips Depo. at 219) ("At this point, I don't even know what would be on the right side or the left side of the equation.").

Finally, Hausman also contends that an accurate economic analysis requires the calculation of a consumer demand curve for each individual concert because each concert is a differentiated product. (Hausman Report ¶ 27.) Hausman points out that Phillips testified that he would only use a single demand curve for each market. (Hausman Report ¶ 29) (citing Phillips Depo. at 222.)

As demonstrated above, Hausman's criticism of the proposed regression analysis goes to the merits of Phillip's methodology rather than whether Phillip's methodology utilizes evidence common to the class members. As emphasized by the numerous cases detailed

---

**46.** *See* J. Hausman, *Exact Consumer Surplus and Deadweight Loss*, American Economic Review, 71 (1981).

in Part V.B, the task before the court "is not to consider the merits ... [but instead] whether generalized evidence exists which will prove or disprove Plaintiffs' claims on a simultaneous, class-wide basis." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 350 (quotation and citations omitted).

Phillips' proposed regression analysis would be based on a common set of data, and Defendants have not shown that individual calculations would be required. This is sufficient to satisfy the predominance requirement. *See, e.g., In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. at 354 (finding that predominance requirement is satisfied where the plaintiffs' expert proffered two "reasonable and commonly-used formulaic approaches to calculating damages"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 350–51 (finding predominance requirement is satisfied where plaintiffs presented a "likely" method for calculating damages based on generalized evidence).

Moreover, while a plaintiff must present a model for calculating damages on a class-wide basis, common issues may predominate even if some individualized issues exist with respect to the calculation of damages as discussed above. *See supra* Part V.D.1.iv.a. *See also Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment."); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *Bogosian*, 561 F.2d at 456 ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should *not* preclude class determination when the common issues which determine liability predominate"); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir.1970) ("where the question of basic liability can be established readily by common issues ... [t]he fact that there may have to be individual examinations on the issue of damages has never been held, however, a bar to class actions"). Thus, even if Hausman's criticisms are valid and the calculation of the amount of damages requires the analysis of some individual issues, this does not preclude class certification.

In sum, the Court holds that common issues of fact and law predominate with respect to market definition, market power, anticompetitive conduct, and antitrust impact. Therefore, the Court concludes that the predominance requirement of Rule 23(b)(3) is satisfied. The Court must proceed to analyze whether a class action is a superior form of adjudication.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

■ In assessing whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy, the court must consider the following factors:

- "the interest of members of the class in individually controlling the prosecution or defense of separate actions;"
- "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;"
- "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and
- "the difficulties likely to be encountered in the management of a class action."

Fed.R.Civ.P. 23(b)(3).

"In adding 'predominance' and 'superiority' to the qualification for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### i. Interest of Class Members in Individually Controlling the Prosecution of Separate Actions

The first factor strongly suggests that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy. First, class members likely incurred minimal damages and prosecution of an antitrust case of this magnitude would be complex and time-consuming. As a result, few if any class members "have incurred damages in an amount sufficient to justify the costs of pursuing an individual action." *In re Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75, 92 (D.Mass.2005). Additionally, thousands of prospective class members exist in each region. Thus, "[e]ven if the claims could be prosecuted individually, their sheer number would make it unlikely that any significant number would be resolved during the lifetimes of the consumer class members." *Id.*

### ii. Extent and Nature of Litigation Already Commenced and Desirability of Concentration of the Litigation in this Forum

The "extent and nature of litigation already commenced" factor "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits.... If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, ... a Rule 23 proceeding only might create another action...." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191 (9th Cir.2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 (2d ed.1986)); *see also Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D.Cal.1996) ("[B]ecause the Court will probably not encounter a problem in terms of being able to enjoin other litigation, this factor also slightly weighs in favor of granting class certification.").

The "desirability of concentration" factor assesses whether potential plaintiffs, witnesses, and evidence are scattered across the country or located close to this forum. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191–92 (9th Cir.2001) (quoting *Haley*, 169 F.R.D. at 653) ("[W]here the potential plaintiffs are located across the country and where the witnesses and the particular evidence will also be found across the country, plaintiffs have failed to establish any particular reason why it would be especially efficient for this Court to hear such a massive class action lawsuit."); *Sweet v. Pfizer*, 232 F.R.D. 360, 373 (C.D.Cal.2005) (same); *Breeden v. Benchmark Lending Group, Inc.*, 229 F.R.D. 623, 631 (N.D.Cal. 2005) ("[S]ince the parties, evidence, and witnesses are all likely to be located relatively close to this particular forum, this Court does not perceive any reason why section (b)(3)(C) counsels against certifying the putative class.")

Because all of the cases from across the country are being handled by this Court as an MDL, these two factors support adjudication of the cases as class actions.

### iii. Difficulties Likely to Be Encountered in Management of the Case

The "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140 (quoting *In re S. Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 423 (M.D.La.1980)). *See also DeLoach v. Philip Morris Companies, Inc.*, 206 F.R.D. 551, 567 (M.D.N.C.2002) ("Though any case of such magnitude certainly poses problems of manageability ... the Manual for Complex Litigation states that '[d]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule.'") (quoting Manual, Part I § 1.43 n. 72 (1977)); 8 von Kalinowski et al., *supra*, § 166.03[3][b][iv] ("Generally, though, class action status will be denied on the ground of unmanageability only when it is found that efficient management is nearly impossible; some courts have stated that there is a presumption against refusing to certify a class on manageability grounds.").

Courts have a variety of management techniques available to deal with the individualized issues of damages. The Second Circuit has explained that "[t]here are a number of management tools available to a district court to address any individualized damages issues

that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d at 141. *See also* Manual for Complex Litigation, Federal Judicial Center, § 21.5 (4th ed.2004) (explaining that a court "may consider trying common issues first, preserving individual issues for later determination ... encourage parties to stipulate to a test case approach ... [use] court-appointed experts to examine cases and report their findings to a jury, subject to cross-examination ... or [adopt] administrative models to administer damages awards, to the extent that such administrative models meet Seventh Amendment standards.")

However, courts primarily rely on bifurcation to deal with the issue of individualized damages.[47] *See* 8 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulations § 166.03[3][a][i] (2d ed. 1997) ("Once liability is established, questions pertinent only to individuals, such as the nature and extent of injury and damages incurred by each class member, may be adjudicated in separate actions.") For example, in the *In re Exxon Valdez* class action, the Ninth Circuit observed that the district court did a "masterful job" where it divided the litigation into four phases: (1) liability for punitive damages, (2) class compensatory damages, (3) punitive damages, and (4) individualized compensatory damages. 270 F.3d 1215, 1225 (9th Cir. 2001). Similarly, in *Arthur Young & Co. v. U.S. Dist. Court*, the Ninth Circuit affirmed the district court's decision to bifurcate the issues of liability from individual damages in

a class action. 549 F.2d 686, 697 (9th Cir. 1977). *See also Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1194 (6th Cir.1988) (explaining that the district court had trifurcated common liability issues, causation for the class plaintiffs, and damages for the class plaintiffs, and deferred individualized hearings on causation and damages for other purported class members until after the trial in mass tort class action); *In re Bendectin Litig.*, 857 F.2d 290, 307–320 (6th Cir.1988) (affirming district court's trifurcation of liability, causation, and damages in products liability class action); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n. 11 (2d Cir. 1975) (explaining that liability could be determined at trial and "[t]he amount of such injury could then be computed at a separate trial for damages, and appropriate substratification of classes could be utilized to facilitate that determination."); *In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456, 468–70 (D.Wyo.1995) (creating trial plan whereby liability, causation for the class plaintiffs, and damages for the class plaintiffs were determined at trial and issues involving causation and damages for the rest of the purported class members were deferred until after trial); *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532, 534–35 (N.D.Ga.1972) (ruling that "[i]f liability is established, other issues, including damages, can be handled later, perhaps on a class member-by-class member basis.")

As discussed above, impact and the amount of damages can be proved through the use of common evidence and methodologies. Moreover, the Court observes no reason why the issues of liability and damages could not be bifurcated for the purposes of summary judgment or trial. Therefore, the Court holds that all of the Rule 23(b)(3) factors support the determination that a class action is superior to other available methods of adjudication.

---

**47.** Bifurcation is limited by the Seventh Amendment *to the extent that the Seventh Amendment* generally "entitles parties to have facts decided by one jury and prohibits a second jury from reexamining those facts." Manual for Complex Litigation, Federal Judicial Center, § 22.93 (4th ed.2004) (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir.1996)); *see also Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir.1999) ("At

bottom, issues may be divided and tried separately, but a given issue may not be tried by different, successive juries."). "The test is whether the issues can be presented separately to different juries without generating 'confusion' and 'uncertainty.'" Manual for Complex Litigation, § 22.93 (citing *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)).

In sum, the Court concludes that Plaintiffs have satisfied the four requirements of Rule 23(a), demonstrated that common issues of law and fact predominate, and have shown that a class action is the superior method of adjudicating these controversies. Therefore, class certification is appropriate.

## VI. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants have also filed a motion for judgment on the pleadings on Plaintiffs' second cause of action for attempted monopolization in violation of 15 U.S.C. § 2.

### A. Legal Standard Governing a Rule 12(c) Motion for Judgment on the Pleadings

Federal Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R.Civ.P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1990). "The standard on a motion for judgment on the pleadings is the same as that applied on a motion pursuant to Fed.R.Civ.P. 12(b)(6)." *Martinez v. Snow*, 2006 WL 3654618, at *3 (E.D.Cal. Dec.12, 2006). Where the argument is that Plaintiff fails to state a claim, "the motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." [48] *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th

Cir.1988). The complaint should be construed in Plaintiff's favor for purposes of a 12(c) motion. *Martinez*, 2006 WL 3654618, at *3. Since Plaintiffs are the non-moving party, the allegations of the complaint "must be accepted as true." *Hal Roach*, 896 F.2d at 1550.

Generally speaking, "judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Id.* There are two exceptions to this rule: (1) documents cited in the complaint that are not submitted with it, and (2) "matters of public record." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–90 (9th Cir.2001); *see also Morgan v. County of Yolo*, 436 F.Supp.2d 1152, 1155 (E.D.Cal.2006). As to the latter, "a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee*, 250 F.3d at 689 (quoting Fed.R.Evid. 201(b)). For example, "when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Id.* at 690 (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426–27 (3d Cir.1999)).

### B. Elements of a Sherman Act § 2 Attempted Monopolization Claim

"The following facts must be proved to establish an attempt to monopolize claim: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization;

**48.** In *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." For fifty years, this legal standard remained unchanged. However, the Supreme Court has recently abrogated *Conley's* rule. In referring to *Conley's* "no set of facts" language, the Court determined that it "has earned retirement" and that "[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard," *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, ——, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). The *Twom-*

*bly* Court did not seemingly evince an intent to overrule Rule 8(a)'s limited notice pleading requirements. *Id.* at 1964 ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."). Yet, the Court now requires a plaintiff to proffer "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. Consequently, a Rule 12(b)(6) motion should be granted where the plaintiffs have failed to "nudge[ ] their claims across the line from conceivable to plausible." *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (citation omitted).

(3) dangerous probability of success; and (4) causal antitrust injury." *Pacific Exp., Inc. v. United Airlines, Inc.* 959 F.2d 814, 817 (9th Cir.1992) (citing *Movie 1 & 2 v. United Artists Communications, Inc.,* 909 F.2d 1245, 1254 (9th Cir.1990), cert. denied, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991)); *see also Amarel v. Connell,* 102 F.3d 1494, 1521 (9th Cir.1996) (same); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432–33 (9th Cir.1995) (same).

### C. Does Plaintiffs Lack Standing to Bring an Attempted Monopolization Claim?

Defendants argue that Plaintiffs lack antitrust standing to bring a Sherman Act § 2 attempted monopolization claim. A plaintiff's antitrust claim may be dismissed for a lack of standing as a matter of law. *Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1309 (9th Cir.1978).

#### 1. Antitrust Standing

██ "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.... [T]here is a point beyond which the wrongdoer should not be held liable." *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 534–535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Because it is "virtually impossible to identify a black-letter rule that will dictate the result in every case," the Supreme Court has identified five factors in determining whether a plaintiff has standing: (1) whether the nature of the plaintiff's injury is the type the antitrust laws were intended to forestall; (2) the directness and speculative nature of the injury; (3) the existence of more direct victims; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages. *Id.* at 537–45, 103 S.Ct. 897. The Ninth Circuit has explained that a court should balance these factors, *see Amarel v. Connell,* 102 F.3d 1494, 1507 (9th Cir.1996), and no single factor should be controlling. *American Ad Mgmt., Inc. v. General Tel. Co.,* 190 F.3d 1051, 1055 (9th Cir.1999).

#### 2. Application of the Five Associated General Factors

██ Defendants argue that Plaintiffs lack standing because Plaintiffs' injury claim is too indirect or speculative and because Defendants' competitors are the proper plaintiffs for this claim of relief. (Def.'s Mot. At 7–11.) Defendants do not address the other three factors.

##### i. Whether Plaintiff's Injury Is the Type Antitrust Laws Were Designed to Prevent

The Ninth Circuit has explained that "the nature of the plaintiff's alleged injury is of 'tremendous significance' in determining whether a plaintiff has antitrust standing." *Amarel,* 102 F.3d at 1507 (quoting *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1470 n. 3 (9th Cir.1985)). Defendants do not discuss this factor and it likely would strongly favor a finding of standing. The Ninth Circuit has held that a showing of "antitrust injury" is necessary for the first factor to weigh in favor of a finding of standing. *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir.2000). "Antitrust injury" is defined as: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at 987, *See also Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 333, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.") (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). As explained above. Plaintiffs allege Defendants have engaged in a range of anticompetitive conduct in violation of the law. Furthermore, Plaintiffs allege they have suffered injury in the form of the payment of supra-competitive prices for tickets. This harm, if proven, would flow from the illegal anticompetitive effect of Defendants' conduct allowing it to engage in monopolistic pricing practices. Finally, as the harm alleged results from decreased competition and increased prices it is "of the

type antitrust laws were intended to prevent." 190 F.3d at 1057.

#### ii. Whether Plaintiffs' Claim Is Too Indirect or Speculative

Plaintiffs' claim that they suffered damage by being charged supra-competitive ticket prices by Clear Channel. (Riley Compl. ¶¶ 64, 68.) Because monopoly power is required to charge supracompetitive prices/ Defendants claim that Plaintiffs could not have suffered damages in the form of supracompetitve prices based on an *attempted* monopolization as a matter of law. Therefore, Defendants claim that Plaintiffs' damages are non-existent as a matter of law. Defendants rely principally on *In re Air Passenger Computer Reservation Systems,* 727 F.Supp. 564 (C.D.Cal.1989).

In *Air Passenger Computer Reservation Systems,* a group of airlines bought an antitrust action against the owners of the two leading airline computer reservations systems. *Id.* Similar to this case, the airlines alleged two causes of action: (1) monopolization and (2) attempted monopolization. With respect to the monopolization claim, the airlines alleged injury based on the overcharges paid for tickets booked through the defendants' computer reservation systems. *Id.* at 566–67. With respect to the attempted monopolization claim, the airlines alleged injury based on defendants' liquidated damages clauses imposed on travel agents who breached contracts with the defendants for usage of their reservation system. *Id.*

The district court held that the airlines lacked standing for the attempted monopolization claim. *Id.* at 569–70. The district court explained that "supracompetitive rates are the result of monopoly, not attempted monopoly ... supracompetitive pricing does not result from an attempt to monopolize when the monopolization is not achieved." *Id.* The court concluded that "[o]nly when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers." *Id.* at 569. As a result, the court determined that the plaintiff airlines could not have suffered damages as a matter of law with respect to the attempted monopo-

lization claim and therefore the plaintiffs lacked standing.

Defendants' argument fails when the specific allegations in the complaint are examined. In cases such as *Air Passenger,* the alleged anticompetitive conduct was predatory pricing. *See, e.g., Air Passenger,* 727 F.Supp. at 566; *Hahn v. Rifkin/Narragansett South Florida CATV Ltd. Partnership,* 941 F.Supp. 1196, 1199 (S.D.Fla.1996). Predatory pricing is "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). *Air Passenger* was correct in recognizing that consumers could not be harmed by predatory pricing because consumers actually benefit in the short-run in the form of lower prices. Consumers would not be harmed until the predator attained monopoly power through the predatory pricing and subsequently raised prices to supra-competitive levels to recoup the lost profits.

Plaintiffs do not allege that Defendants engaged in predatory pricing in an attempt to attain monopoly power in the concert promotion market. Instead, Plaintiffs claim that Clear Channel bids up the fees for artists to levels at which competing promoters cannot compete. (Riley Compl. ¶ 46.) For example, Plaintiffs allege that Clear Channel will guarantee artists more than 100 percent of gross sales in exchange for the right to promote the artist's concert, (*Id.*) As a result, competing producers must either pass on such artists or promote the artists at a guaranteed loss. (*Id.*)

This conduct is aimed at achieving the same result as predatory pricing—the elimination of competitors. Additionally, both this conduct and predatory pricing cause the aspiring monopolist to incur short-term losses. However, the crucial difference between the alleged conduct and predatory pricing is the effect on the ultimate consumer. Under a predatory pricing scheme, consumers benefit in the short-run in the form of lower prices because the predator is selling at below cost. In contrast, Plaintiffs allege that Defendants bid up the fees for artists and

pass on these higher costs to consumers in the form of higher ticket prices.[49] As a result, consumers suffer harm in the short-run even though Defendants have not yet attained monopoly power.

Defendants also cite *Paycom Billing Services v. Mastercard International*, 467 F.3d 283 (2d Cir.2006), for the proposition that consumers' antitrust injuries, when they derive from attempted monopolization conduct directed at defendant's rivals, are too remote to create standing. However, the court in *Paycom Billing* arrived at its conclusion after analysis of the particular anticompetitive scheme alleged and its likely impact on plaintiffs. *Id.* at 293.[50] As this is a motion for judgment on the pleadings, the Court must assume that Plaintiffs' allegations are true. Plaintiffs, as noted above, have alleged that Defendants engaged in supracompetitive pricing in the course of and as a result of their attempted monopolization. If true, this would mean that Defendants charging of supracompetitive prices was a "necessary step" in their anticompetitive practices and injury to the Plaintiffs was "inextricably intertwined" with the injuries to Defendants' competitors so as to allow consumer standing. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479, 484, 102 S.Ct. 2540, 73 L.Ed.2d 149

(1982). Though these claims prompt some skepticism, they are not implausible allegations in the concert promotion context, as discussed above. For example, Defendants may have charged supracompetitive prices while engaging in anticompetitive practices and the charging of such prices may have been an integral aspect of their attempted monopolization scheme. On further factual development, it is possible that Plaintiffs will fail to establish their allegations and this factor will consequently weigh heavily against them. However, at this stage of the litigation, Plaintiffs' allegations are sufficient to establish that the Plaintiffs' allegations regarding damages are neither too indirect nor too speculative. Therefore, this factor weighs in favor of a finding of standing.

### iii. Whether Defendants' Competitors Are More Direct Victims

Defendants emphasize that the attempted monopolization claims focus on Defendants' conduct against competitors rather than consumers. (Def.'s Mot. At 11.) Defendants therefore conclude that Plaintiffs' alleged injury is purely derivative of any direct injury to competitors. (*Id.*) As discussed *supra* Part III, at least one competitor has already sued Defendants for essentially the same

---

**49.** Defendants are allegedly able to pass on these higher costs to consumers because the elasticity of demand for individual artists is low. As discussed in Part V, the fact that the elasticity of demand for individual artists is low does not mean that the price cross-elasticity between artists is low. As a result, the fact that Defendants can pass on the higher costs to consumers does not compel the conclusion that each artist constitutes a distinct product market.

**50.** Defendants cite a number of other district court opinions from other circuits denying standing to consumers for attempted monopolization claims, some with virtually no analysis of the scheme at issue. *Wojcieszek v. New England Telephone and Telegraph Company*, 977 F.Supp. 527, 535 (D.Mass.1997); *Simpson v. U.S. West Communications, Inc.*, 957 F.Supp. 201, 205–206 (D.Or.1997); *Hahn v. Rifkin/Narragansett South Florida CATV Limited Partnership*, 941 F.Supp. 1196 (S.D.Fla.1996); *Davis v. Southern Bell Telephone & Telegraph Co.*, 1994–1 Trade Cas (CCH) ¶70,510 (S.D.Fla.1994); *O'Neill v. Coca-Cola Co.*, 669 F.Supp. 217, 222–24 (N.D.Ill.1987). However, to the extent these opinions deny standing to consumers as a matter of course, they rely on the assumption that a defendant cannot engage in supracompetitive

pricing until they have achieved monopoly power. As already noted, this is not necessarily true due to the unique circumstances of this case. At the same time, in *Davis v. Pacific Bell*, 204 F.Supp.2d 1236, 1241 (N.D.Cal.2002), a federal district court found antitrust standing for consumers making an attempted monopolization claim on the basis of injuries arising both from anticompetitive practices directed at consumers and from the charging of supracompetitive prices enabled by those practices. *See also Strong v. BellSouth Telecommunications, Inc.*, 1994 WL 1016699, at *3 (W.D.La.1994) (noting that "consumers may have standing"). Defendants argue that these cases are distinguishable because the harm to the consumers resulted, in part, directly from the defendant phone companies' anticompetitive conduct. However, in neither opinion was there any indication that consumers' suffering of direct harm from defendants' anticompetitive practices was dispositive in the overall finding of antitrust standing. Thus, these cases demonstrate that the issue of consumer standing is not subject to a per se rule, but instead a case-by-case determination.

attempted monopolization in the Denver market. *NIPP*, 311 F.Supp.2d at 1048. The harm suffered by competitors is distinct from the harm suffered by consumers rather than purely derivative, as discussed immediately below. Nonetheless, it is a straightforward proposition that competitors' injury in being forced out of the market is a more direct result of Defendants' alleged attempted monopolization than the harm to Plaintiffs in paying supracompetitive prices. Defendants' charging of supracompetitive prices is alleged to be enabled and motivated by its anticompetitive practices. Injuries resulting from such prices therefore must be regarded as a less direct result of Plaintiffs' anticompetitive practices than injuries resulting from the practices themselves. *See Lucas v. Bechtel Corp.* 800 F.2d 839, 845 (9th Cir. 1986) (finding competitors to be more direct victims of conspiracy to monopolize market than employees who suffer depressed wages as a result of monopoly). The Supreme Court has held that "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. 897. The existence of competitors who have economic incentive to sue Defendants for more direct harm resulting from the same attempted monopolization conduct at issue here weighs against a finding of standing. However, this factor, as discussed below, is not conclusive.[51]

#### iv. Whether There Is a Risk of Duplicative Recoveries

The Ninth Circuit has explained that "[t]he risk to be avoided under [this factor] is that potential plaintiffs may be in a position to assert conflicting claims to a common fund . . . thereby creating the danger of multiple liability for the fund." *American Ad*, 190 F.3d at 1059. In this case, there is no risk of duplicative recovery because the harm to consumers is distinct from the harm to Defendants' competitors. For example, ticket purchasers allegedly suffered damages in the form of higher ticket prices, whereas competing promoters suffered damages in the form of lost profits. Additionally, Defendants have not addressed this factor in their motion.

#### v. Whether Apportionment of Damages Would Be Complex

As compared to the apportionment of damages necessary in *Associated Gen. Contractors*, where the court held this factor weighed against finding, the apportionment of damages in this case is relatively straightforward. Unlike *Associated Gen Contractors*, there is no need to apportion among directly and indirectly harmed Plaintiffs, nor is there a need to determine to what extent Plaintiffs absorbed or passed on damages. As discussed above *supra* Part V.D.1.iv concerning the proposed regression analysis, all that is necessary to calculate damages for each class member is application of the regression analysis. Additionally, Defendants have not addressed this factor in their motion. Therefore, this factor weighs in favor of standing.

#### vi. Weighing of the Five Factors

Overall, all except one of the factors likely weighs in favor of standing. Additionally, the Ninth Circuit has emphasized that the first factor—which weighs in favor of standing—deserves particular weight. Therefore, the Court holds that Plaintiffs have antitrust standing to bring the attempted monopolization claims against Defendants for purposes of resolving Defendants' motion for judgment on the pleadings.[52]

---

**51.** Defendants claim this factor "weighs 'heavily' against Plaintiffs' standing to bring suit." (Def. Mot. at 11). However, the opinion cited for this proposition is in fact describing the relative weight of four factors when using the term "heavily" rather than only this factor. *See Associated Gen. Contractors*, 459 U.S. at 545, 103 S.Ct. 897. There is no indication that this factor

has any special weight in the antitrust standing analysis.

**52.** Plaintiffs also argued that they have standing because they are seeking injunctive relief under § 16 of the Clayton Act. The Court need not reach this issue because the Court finds that standing exists for the reasons discussed above. Additionally, Plaintiffs have represented that they

## VII. CONCLUSION

In certifying the classes, the Court is not indicating whether it believes Plaintiffs may succeed in proving their claims on the merits. When the Court is at liberty to conduct a full *Daubert* analysis, Defendants' arguments may very well carry the day. However, this order views the allegations, expert testimony, and evidence through the very narrow prism permitted by *Dukes*.[53] Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a) and demonstrated that common issues of fact and law predominate. Additionally, a class action is a superior method for adjudicating this controversy because resolution of common questions of market definition, market power, anticompetitive conduct, and antitrust impact in these class actions is more efficient than re-litigating these common issues on a case-by-case basis thousands of times. Therefore, the Court GRANTS Plaintiffs' motions to certify the class.

With respect to the Chicago class, *Malinda Riley v. Clear Channel Communications, et al.*, CV 06–2381–SVW (RCx) (Chicago Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the Chicago Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present." With respect to the Boston class, *Kevin MacLaughlan v. Clear Channel Communications Inc.*, CV 06–5012 SVW (RCx) (New England Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the New England Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present." With respect to the New York/New Jersey class, *Hayes Young v. Clear Channel Communications Inc.*, CV 06–3701–SVW (RCx), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the New York/New Jersey Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present." With respect to the Denver class, *Lauren Hammer v. Clear Channel Communications Inc.*, CV 06–4987–SVW (RCx) (Colorado Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the Colorado Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present." With respect to the Southern California class, *Margaret Thompson v. Clear Channel Communications, Inc., et al.*, CV 05–6704–SVW (RCx) (Southern California Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the Southern California Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present."

The Court vacates Plaintiffs' motion for a modification of the pretrial scheduling orders and sets a status conference for Monday, November 5, at 1:30 P.M. The parties should be prepared to discuss the following issues: (1) whether Defendants will appeal this Court's order pursuant to Rule 23(f); (2) whether and how the case should be bifurcated for purposes of motions for summary judgment; (3) modification of the pretrial scheduling order regarding the five cases in which the class has been certified; (4) whether the other seventeen cases should continue to be stayed; and (5) any other scheduling issues. IT IS SO ORDERED.

---

are no longer pursuing a claim for injunctive relief because Defendants have spun-off their concert promotion business into an independent, publicly traded entity named Live Nation, Inc. (Def.'s Reply at 11.)

**53.** The Court also notes that the result might have been vastly different if the MDL panel had selected a district court in a different circuit to serve as the MDL court. For example, if the MDL panel had assigned the cases to the Southern District of New York, the district court could have engaged in a more probing analysis of the Rule 23 factors pursuant to *In re IPO Securities Litig.*